*381 OPINION OF THE COURT
Diane A. Lebedeff, J.
This proceeding poses fundamental legal issues which arise when a new owner, the purchaser at a foreclosure sale of a cooperative building, brings a reforeclosure or strict foreclosure action to terminate the still existing interests of individual proprietary lessees. The instant motion in this reforeclosure proceeding requests the setting of use and occupancy for just such tenants in a New York City multiple dwelling.[1] It is relevant that the proprietary lessees are previously rent-regulated tenants who purchased pursuant to a noneviction plan conversion.
The building involved is located at 605 West End Avenue, Manhattan. It was the subject of a foreclosure proceeding brought by Apple Bank for Savings (Sup Ct, NY County, Index No. 6656/91 [hereinafter Apple foreclosure]). Although the building was converted to cooperative status pursuant to a noneviction plan in 1989, not all units in the building appear to have been purchased by cooperative lessees.[2] The defendants were not joined as parties in the Apple foreclosure (Apple foreclosure, order of Oct. 31, 2000).[3]
*382 Pursuant to a foreclosure sale held in April of 2000, plaintiff became the owner of the building. After being held ineligible to receive a writ of assistance and then commencing and withdrawing two holdover summary proceedings, all in relation to these three defendants, plaintiff commenced this reforeclosure proceeding.
Mortgage Foreclosure, Reforeclosure and Strict Foreclosure
Because of the failure to join these proprietary tenants as parties in the mortgage foreclosure proceeding (see, RPAPL 1311 as to naming defendants), each tenant not named in the foreclosure proceeding continued to hold unextinguished interests, including a possessory right and a right of redemption (6820 Ridge Realty v Goldman, 263 AD2d 22, 25-26 [2d Dept 1999]). To terminate such rights, the purchaser at a foreclosure sale may bring either a reforeclosure proceeding or a strict foreclosure proceeding (263 AD2d at 26-27). Plaintiffs counsel characterizes this proceeding as sounding in reforeclosure.
A reforeclosure “is an actual foreclosure action, which may proceed all the way to a foreclosure sale” (3 Bergman, New York Mortgage Foreclosures § 32.02 [3]; RPAPL 1523 [4]). Re-foreclosure is brought under the normal mortgage foreclosure provisions of article 13 of the RPAPL (i.e., RPAPL 1301 et seq.). There is no time bar which requires reforeclosure be commenced within any specified period running from the original mortgage default, although a statute of limitations is applicable to requests for recovery “[of] any residue of the debt, remaining unsatisfied” (RPAPL 1523 [1]). Reforeclosure may be sought and granted only if “there was a defect in the original foreclosure proceedings * * * not occasioned by the fraud or wilful neglect” of the foreclosure plaintiff (RPAPL 1523 [1]) and “the defendant * * * was not actually prejudiced thereby” (RPAPL 1523 [2]). These defendants have raised a possibly meritorious defense of wilful neglect, based upon the clear record that Apple Bank was well aware of their identity and interests during the original proceeding.
In contrast to reforeclosure, strict foreclosure is “an absolute right” and “whether plaintiff had knowledge of defendant’s lien at the time it took [title] is irrelevant” (2035 Realty Co. v Howard Fuel Corp., 77 AD2d 870, 871 [2d Dept 1980], citing RPAPL 1503). Strict foreclosure, among other differences, does not lead to a sale but would result in an order which “shall provide that a failure to redeem or commence an action for the foreclosure *383 of [a subordinate] mortgage or other lien within [the time fixed by the court] shall preclude such person having a right of redemption” and such interest shall “be extinguished and terminated” (RPAPL 1352).
Use and Occupancy in Reforeclosure of Formerly Stabilized Unit
At the outset, the tenant defendants question whether a re-foreclosure landlord plaintiff may request and receive use and occupancy. It is clear that, absent a court order, a landlord seeking possession must forego rent collection for, as was soundly observed in another reforeclosure proceeding, “It would be grossly inequitable to allow a foreclosure purchaser to accept rent and then, upon an upturn in the rental market, to decide to foreclose the tenant’s interest” (Athena-Liberty Lofts v Just Pies, NYLJ, May 29, 2002, at 18, col 4 [Sup Ct, NY County, Lehner, J.]; see also, Vendome Commercial v 57th St. Video & Photo, NYLJ, Dec. 4, 1996, at 26, col 1 [Sup Ct, NY County, A. Schlesinger, J.] [holding attornment barred strict foreclosure action]; see also, 3 Bergman, New York Mortgage Foreclosures § 33.01 [6]).
The general right to seek use and occupancy is codified in Real Property Law § 220, which states: “The landlord may recover a reasonable compensation for the use and occupation of real property, by any person, under an agreement, not made by deed; and a parol lease or other agreement may be used as evidence of the amount to which he is entitled.” It has been held proper to order the payment of use and occupancy in a proceeding to foreclose a leasehold interest (Dyker Bldrs. Corp. v Markogiannis, 274 AD2d 373 [2d Dept 2000], citing Real Property Law § 220), which is consistent with the general judicial policy granting requests to set use and occupancy pendente lite when a leasehold interest is the subject of civil litigation other than summary proceedings (see, Trump CPS v Meyer, 249 AD2d 22 [1st Dept 1998]; MMB Assoc. v Dayan, 169 AD2d 422 [1st Dept 1991]; Haddad Corp. v Cal Redmond Studio, 102 AD2d 730 [1st Dept 1984]). On these bases, this court holds that an order directing the payment of use and occupancy in a reforeclosure proceeding is legally permissible.
As to setting a dollar amount of use and occupancy for a cooperative apartment subject to foreclosure, the court starts its consideration with the amount of maintenance. In relation to a cooperative tenant, it is “[t]he rule that until [a proprietary lease is terminated] under a judgment of foreclosure, the *384 obligations of an agreement for the occupancy of the premises survive” (Prudence Co. v 160 W. Seventy-Third St. Corp., 260 NY 205, 211 [1932]).[4]
Reforeclosure requires no variation of the above rule. The specifically applicable governing principle is that “if the mortgaged property was transferred subject to the lease, * * * the obligations of the tenant under his agreement were not terminated by the sale” which concluded the foreclosure proceeding (id., summarizing with approval Metropolitan Life Ins. Co. v Childs Co., 230 NY 285 [1921]). No grounds were presented here which might support a scrutiny of the amount of maintenance as “collusive or fraudulent” or “inadequate” (Prudence Co. v 160 W. Seventy-Third St. Corp., supra, 260 NY at 213 [as to whether a cooperative corporation may be prohibited from reducing maintenance during a foreclosure proceeding]; compare, East N.Y. Sav. Bank v 520 W. 50th St., 160 Misc 2d 266 [Sup Ct, NY County 1994, L. Friedman, J.] [denying application to bar maintenance reduction], with Federal Natl. Mtge. Assn. v Lincoln Spencer Apts., NYLJ, June 7, 1995, at 25, col 4 [Sup Ct, NY County 1995, Tompkins, J.] [granting such application]).
With due recognition that the starting point of inquiry must be the maintenance amount, the next consideration is the possible impact of rent regulation rules. As to the building as a whole, for a cooperative building which was rent regulated prior to conversion, foreclosure results in a reversion of cooperative units to rental status and applicable rent regulation rules may take effect (Federal Home Loan Mtge. Corp. v New York State Div. of Hous. & Community Renewal, 87 NY2d 325 [1995]; Federal Home Loan Mtge. Corp. v New York State Div. of Hous. & Community Renewal, 83 F3d 45 [2d Cir 1996]; Greenberg v Colonial Studios, 279 App Div 555 [1st Dept 1951]). For a formerly rent-stabilized building, when “a multiple dwelling is no longer owned as a cooperative, the Rent Stabilization Law and Code again automatically become applicable to it” (De Santis v White Rose Assoc., 152 Misc 2d 567, 571 [Sup Ct, NY County 1991, Saxe, J.]).
*385 Because this building is subject to the New York City rent stabilization system, next required is review of the Rent Stabilization Code provisions, and any proof of compliance with the requirements imposed. It must be noted that the provisions specifically addressing the treatment of foreclosed cooperatives were added to the Rent Stabilization Code on or about December 20, 2000 (Martin Shulman, After 13 Years, A New Rent Stabilization Code, NYLJ, Jan. 31, 2001, at 1, col 1), and this plaintiff owner took title by a foreclosure referee’s deed many months earlier, in April of 2000.
The current Rent Stabilization Code addresses elimination of cooperative ownership of formerly rent-regulated units, terming the process “deconversion,” and the code requires the new owner, within 30 days of deconversion, to offer former shareholders a lease at a rental to be agreed upon by the parties (9 NYCRR 2520.11 [l] [1]).[5] Shortly after these provisions took effect, in January of 2001, plaintiff did make a statement in *386 court papers which offered a “take it or leave it” one-year vacancy rent-stabilized lease at a combined rental for the two units of $6,500 per month, which cannot be found an adequate attempt to reach an agreement as required by the Rent Stabilization Code. Accordingly, plaintiff failed to utilize what appears to be a window period for attempting to reach an agreement on new lease terms.
No evidence was presented that the landlord attempted to secure a rent adjustment under earlier available remedies, which were described in 1995 in Federal Home Loan Mtge. Corp. v New York State Div. of Hous. & Community Renewal (supra, 87 NY2d at 336), as follows:
“[T]he regulations provide several viable mechanisms for setting the initial rent, including a ‘catchall’ or default provision, which applies the ‘rent reserved in the last effective lease’ where no other specific measure applies (Administrative Code § 26-512 [b] [3]). Should that formula prove unworkable, section 2522.6 of the Code provides that where the rent to be charged is unknown, DHCR may make such determination upon written request (see, 9 NYCRR 2522.6 [a]).”
Nor were independent grounds for entitlement to a “first rent” presented, such as proof of any change in the legal configuration of the two apartments into one unit {see Multiple Dwelling Law § 300, as to certificate of occupancy, and Multiple Dwelling Law § 302, limiting recovery of rent to legal units). The parties point to no refutation of the recitation in the Apple foreclosure that two apartments exist.[6]
Finally, no evidence was presented that the maintenance amount was economically insufficient or to refute the general concept that maintenance is an amount capable of economically sustaining a unit’s share of the building expenses with some additional amount included for reserves, so the unit should “pay its way” and provide funds for future repairs. Indeed, the maintenance amount may be ample economically, for the foreclosure eliminated the need to make mortgage pay *387 ments or pay liens and judgments, with the result that this relatively small building carries at least $1 million less debt postforeclosure than it did preforeclosure.
At the same time, setting use and occupancy at the amount of maintenance has a clear negative economic impact upon the tenants who, “as a result of the foreclosure * * * remain obligated to pay their rents, but also must repay the money they borrowed to purchase their units” (Federal Home Loan Mtge. Corp. v New York State Div. of Hous. & Community Renewal, supra, 87 NY2d at 337). Further, because they are no longer cooperative lessees, the tenants have also lost any tax credit allocated to their units for real property taxes and the building’s mortgage interest.
As is clear from the foregoing, plaintiffs notion that use and occupancy on units in a foreclosed cooperative can be fixed upon the landlord’s request for a free market rent is fatally flawed. The instant situation is not legally comparable to a holding over beyond the end of a commercial lease or other lease to which no regulations or limiting precedent apply (see, for example, F.N.S. Atl. Co. v City of New York, 201 AD2d 366 [1st Dept 1994] [commercial lease]). There remains a legally viable contract, which the purchaser knew or should have known before taking title (see, Miller v Schloss, 218 NY 400, 408-410 [1916] [quasi-contractual relief not available where plaintiff voluntarily embarked on a transaction subject to a contract without “mistake, imposition, extortion, or oppression”]; Rand Prods. Co. v Mintz, 72 Misc 2d 621, 622 [App Term, 1st Dept 1973] [a court ignores contracts when use and occupancy set on the basis that a landlord “(is) entitled to compensation for the use of its land * * * without reference to the intention of the parties”] [citations and internal quotation marks omitted]).
Precedent clearly indicates that, as to an unforeclosed proprietary lease, the established maintenance for a unit is the proper measure of relief in equitable proceedings similar to the one at hand. The landlord has not advanced evidence or legal arguments which would justify resort to any different formula.
Because of these factors, the court is satisfied that utilization of the maintenance amount for use and occupancy is both legally and factually appropriate, and fittingly restores the use and occupancy orders issued in the original foreclosure proceeding which were effective until the date plaintiff took title. Accordingly, the court sets use and occupancy at $650 per month for unit GF and $936 per month for unit GR.
*388 The proprietary leases shall be deemed the rental agreements for the purposes of regulating the relationship of the parties pendente lite.[7] During the course of this proceeding, for the purposes of use and occupancy, increases will be permitted consistent with rent stabilization guidelines upon the anniversary of this order and the tenants shall be permitted to elect a one-year or two-year extension at appropriate guideline adjustments.
Because the landlord has not demonstrated that the units have been registered with the rent stabilization system, the landlord is directed to register with the appropriate rent regulatory agency and to advise the court of such action.
Limits on Relief in Reforeclosure
As should be clear from the foregoing, reforeclosure is a particularly limited remedy where rent regulation protections apply to residential tenants who simultaneously retain some last vestiges of status as cooperative tenants. The two narrow issues which are relevant to this proceeding — possessory rights and the equity of redemption — are clear and certain.
As to the landlord’s right to regain possession, as an abstract matter, reforeclosure or strict foreclosure properly does lie against a tenancy for years (6820 Ridge Realty v Goldman, supra; 3 Bergman, New York Mortgage Foreclosures § 32.07). For reasons stated above, it is beyond debate that the tenants are entitled to the status and protections of rent-regulated tenants (3 Bergman, New York Mortgage Foreclosures § 33.05 [1], [2]). The court must recognize the statutory roots of the tenancy and follow “the overarching goal of the regulatory scheme * * * to protect tenants — who would otherwise be vulnerable to New York City’s housing crisis — from eviction and spiraling rents” (Federal Home Loan Mtge. Corp. v New York State Div. of Hous. & Community Renewal, supra, 87 NY2d at 334). These tenants have an independent basis for their possessory rights grounded in rent regulatory laws, which rights cannot be extinguished by foreclosure, reforeclosure, or strict foreclosure.
*389 As to the equity of redemption, even if exercised, it would not restore the cooperative nor make the tenants the owner of the building. To the contrary, if there were redemption and payment of the proper amount, the “redeeming party becomes the holder of the mortgage,” while the owner becomes hable on the mortgage (3 Bergman, New York Mortgage Foreclosures § 32.11 [4]).
Further, an election regarding redemption must be made prior to any computation of the redemption price.[8] The tenants will receive no benefit of the bargain secured by the owner’s foreclosure bid, for the redemption price will start with the amount due on the mortgage, allegedly some $2.4 million, rather than the $1.5 million paid at the foreclosure sale (50 E. 78 v Paneth, 247 AD2d 222, 222 [1st Dept 1998] [“We perceive no reasons in equity for departing from the well settled rule that junior mortgagees who were not joined in the foreclosure of a senior mortgage, and who desire to exercise their right to redemption, must pay not merely the amount bid at the auction but the amount due on the mortgage”]).
Moreover, the process becomes seemingly circular, for, although one who redeems will receive the mortgage (see, River Bank Am. v Stabile, 216 AD2d 104 [1st Dept 1995] [assignment of the mortgage can be compelled by court order]), the owner may use the redemption proceeds to pay the mortgage debt; alternatively, if the mortgage is not brought current, the redeeming party is entitled to begin the foreclosure cycle anew by foreclosing the mortgage. With this framework, the tenants surely should have some views on the likelihood of their exercising their equity of redemption if plaintiff succeeds in this litigation.
What the pleadings do not clarify, if plaintiff prevails, is if the court will be asked to decide about the rental and the terms of any rental agreement. As to the rent level, the rental might *390 ultimately be resolved by the rent agency. No party has advanced any administrative determinations or unpublished opinions which would shed light on the procedures or factors to be considered beyond those set forth above.
As to any lease terms, there appear to be only four options and the parties would be well advised to agree upon one of them even if they do not agree upon rental amount. First, the parties might agree upon a new written lease for a postforeclosure tenancy (9 NYCRR 2520.11 [l] [1]), although application of the rule might not be timely. Second, the parties could proceed under the proprietary lease with the omission of clauses contrary to rent stabilization for reasons set forth above. Third, reinstatement of the terms of the preconversion stabilized lease is possible for these defendants had stabilized leases prior to becoming cooperative tenants on the building’s conversion (see, Matter of David v New York City Conciliation & Appeals Bd., 59 NY2d 714, 716 [1983] [“Although the broad purpose of the Rent Stabilization Law is to protect the interests of tenants, the means adopted is stabilization or ‘freezing’ of the terms of existing rental agreements. This affords a measure of protection to both parties by permitting the tenant to renew the lease on its original terms, with limited statutory adjustments, while protecting the landlord against the loss of the contractual rights for which it originally bargained”]). Fourth and finally, an unwritten rental agreement would be permissible under the rent stabilization system (Haley v Clayton, 106 Misc 2d 739 [Civ Ct, NY County 1980, Lebedeff, J.]), even if it only covered whether the lease had a term of one or two years.
Based upon the foregoing, the report of the referee is disaffirmed and use and occupancy is set as set forth above. Prospective use and occupancy shall be paid by the fifth day of each month by good funds delivered to the office of plaintiffs counsel and arrears to the date of the taking of title shall be paid in the same manner within 45 days of the date of this decision. Should use and occupancy not be paid, the court will direct an immediate trial.

. The issue of value of use and occupancy was referred to a special referee to hear and report. The special referee interpreted the reference order as requiring inquiry into a free market rental value and recommended use and occupancy of $6,500 per month jointly for the two units leased by defendants. The motions to confirm and disaffirm the report are consolidated for disposition. Because the court had not directed inquiry into a free market rent level for reasons made clear herein, the recommendation is disaffirmed. The court, on its own motion, resumes consideration of the underlying request to fix use and occupancy, taking into its consideration all arguments and evidence, including those presented to the referee.

. In the period in which this building was converted to cooperative ownership, noneviction plans became effective if 15% or more of the tenants purchased. A detailed review of the cooperative conversion requirements imposed by General Business Law § 352-eeee, as amended over the course of time, for conversions of residential buildings both inside and outside of New York City, appears in Langdale Owners Corp. v Lane (166 Misc 2d 439, 442-444 [App Term, 2d Dept 1995]).

. Defendants Gregory Cole and Catherine Cole are husband and wife. Gregory Cole, together with defendant Mary Miller, purchased the shares allocated to apartments GR and GF. The Coles are described as having been rent-stabilized tenants prior to the conversion, but it is not established whether the Coles were rent-stabilized tenants of GR, GF or both GR and GF. Counsel have presented no fine distinctions between the rights of the three defendants and the court will refer to them as if they were all proprietary lessees and entitled to rent stabilization status, without prejudice to future arguments. Although GR and GF are referred to as if they were a single unit, there is no confirmation that GR and GF were actually or legally combined into one unit.

. During the Apple foreclosure, use and occupancy was judicially fixed at the maintenance amount as the “reasonable rental value” of these premises (order of June 2, 1992, M. Evans, J.; see also, order of Mar. 31, 1994, reciting same amounts). The receiver recognized these amounts in a stipulation and there was no judicial order of revision. Of course, use and occupancy cannot be collected under these orders after the judicial sale of the premises (Banque Arabe Et Internationale D’Investissement v One Times Sq. Ltd. Partnership, 223 AD2d 384 [1st Dept 1996]).

. This process is governed by section 2520.11 (Z) (1) of the Rent Stabilization Code (9 NYCRR), which states in relevant part:
“(1) where cooperative or condominium ownership of such building no longer exists (deconversion), because the cooperative corporation or condominium association loses title to the building upon a foreclosure of the underlying mortgage * * * such housing accommodations shall revert to regulation pursuant to the RSL and this Code, and the regulated rents therefor shall be as follows: * * *
“(ii) Housing accommodations occupied at the time of deconversion and not subject to regulation under this Code at such time.
“(a) Where the housing accommodation is occupied by a holder of shares formerly allocated to it in the case of cooperative ownership, or by the former owner of such unit in the case of condominium ownership, such shareholder or former unit owner shall be offered a new vacancy lease, subject to regulation under this Code, by the new owner taking title upon deconversion, which lease shall be subject to all of the terms and conditions set forth in subparagraph (i) of this paragraph pertaining to the establishment of initial regulated rents, lease offer, and deregulation, including subclause (i)(d)(2) of this paragraph.
“(b) [inapplicable]
“(c) All shareholders or former unit owners described in this subparagraph shall be offered a vacancy lease within 30 days after the deconversion, and shall have 30 days to accept such offer. However, in the event such shareholder or former unit owner does not enter into the vacancy lease, he or she shall be deemed to have surrendered all rights to the housing accommodation effective 120 days after the deconversion.” (Emphasis added.)
As to the rules incorporated by reference, the initial regulated rent “shall be as agreed by the parties” (§ 2520.11 [Z] [1] [i] [a], for a deconversion more than four years after the cooperative conversion), provided that rent regulation would not apply if “the rent, as agreed upon by the parties and paid by the tenant is $2,000 or more per month” (§ 2520.11 [Z] [1] [i] [c] [1]).

. If there were improvements to the units, it would be critical to establish whether the tenant paid for the improvements and consider that factor when fixing a rental equivalent or a stabilized rent (Wilson v One Ten Duane St. Realty Co., 123 AD2d 198, 201 [1st Dept 1987] [“It would be a ridiculous perversion of the (rent stabilization) statute to hold when (rehabilitation) costs are substantially borne by the tenants it would qualify the landlord for unregulated rent and leave the tenants defenseless against increased exactions”]). No evidence was presented on this issue.

. If either proprietary lease contains clauses contrary to basic precepts of rent stabilization, such clauses should be viewed as void and subject to being stricken (see, Rima 106 v Alvarez, 257 AD2d 201, 207 [1st Dept 1999] [declaring void and unenforceable rent-stabilized lease clauses inconsistent with rent stabilization principles, including unlimited subletting]; Park Towers S. Co. v Universal Attractions, 274 AD2d 312 [1st Dept 2000] [nullified waiver of right to bring nonprimary occupancy eviction in a rent-stabilized lease]).

. If the landlord prevails at trial, the judgment sets the time within which the tenants must give notice of their intention to redeem. Only if they timely file a notice of such intention with the court and serve a copy upon other parties does the court appoint a referee to compute, who also reports upon an accounting of rents, profits, taxes and improvements (3 Bergman, New York Mortgage Foreclosures § 32.10). Starting with the amount due on the mortgage, the referee must adjust this figure consistent with accounting principles (see, RPAPL 1522; 15 Carmody-Wait 2d, NY Prac, Redemption from Mortgage on Real Estate § 95:4, at 387; Merrill Lynch Bus. Fin. Sys. v Schambra, 237 AD 2d 418 [2d Dept 1997] [to set reforeclosure redemption price, increase mortgage amount due by value of purchaser’s improvements, but reduce by rents and profits received, as well as use and occupancy owed]).