[690 NYS2d 40]

RIMA 106, L.P., Appellant, v ROXANNA ALVAREZ et al., Respondents.

RIMA 106, L.P., Appellant, v CAROLE CLARK et al., Respondents.

First Department, May 13, 1999

### APPEARANCES OF COUNSEL

*Gary M. Rosenberg* of counsel (*Jeffrey Turkel* and *Bruce H. Wiener* on the brief; *Rosenberg & Estis, P. C.,* and *Fischbein Badillo Wagner Harding,* attorneys), for appellant.

*Carol Anne Herlihy* of counsel (*Kellner Chehebar & Deveney,* attorneys), for Roxanna Alvarez and others, respondents.

*Mark S. Rudd* (*Linda Skoller-Burton* on the brief), for Carole Clark and others, respondents.

### OPINION OF THE COURT

Wallach, J.

On these appeals we confront, in the context of motions for summary judgment, the viability of two residential "sweetheart" apartment leases made by plaintiff landlord's predecessor in title which are now challenged by plaintiff on myriad grounds, including statutory and public policy illegality. Plaintiff in both actions, the net lessee of two Upper West Side Manhattan buildings known as 211 and 207 West 106th Street, took assignment of the ground leases thereto as the

successful bidder at a foreclosure auction in 1994, following a lengthy receivership of almost seven years duration. Defendant Alvarez in the first action is the rent-stabilized tenant of apartment 11-D at 211 West 106th Street. Defendant Clark in the second action is the rent-stabilized tenant of record of apartment 15-D at 207 West 106th Street, and defendant Melissa Stein is her adult daughter.

In early 1987, the buildings were owned by Filroben Associates, of which Robert Postel and Filip DiSanza were principals. Filroben was insolvent at that time, and the properties were on the verge of foreclosure. On a date yet unknown, Filroben issued a lease for the 11th floor apartment at number 211 to tenant Alvarez, dated "as of January 1, 1987." Mr. DiSanza was apparently the uncle of tenant Alvarez. The foreclosing mortgagees filed their notice of pendency three weeks later, on January 22, and within days commenced their foreclosure action against Filroben.

The conveyance of the apartment in the second action to defendant Clark is somewhat more complex. In mid-1985, Elliot Clark, the brother of tenant Carole Clark, owned and operated a plumbing company that had accumulated unpaid bills of $30,000 to $40,000 for work in the buildings. At that time, Filroben, which was attempting to convert the premises to cooperative ownership, was unable to pay. Filroben and Elliot Clark struck a deal, as described by Mr. Clark in his affidavit in the record: "Mr. Postel suggested providing me with rent stabilized leases to two apartments in the building premises with provisions that would make the leases and my tenancy in the apartments economically valuable. I ultimately agreed to this suggestion." Filroben issued a lease for the 15th floor apartment at number 207 to Mr. Clark's sister, "as of July 1, 1985", and as part of the deal, Mr. Clark also got a lease for a 10th floor apartment in the same building (which is not at issue here).

Plaintiff challenges with particularity three "sweetheart" provisions of the riders to the leases before us, purporting to grant to the tenants unlimited subletting rights at the tenants' sole discretion, without requiring the owner's consent (Clause B); unlimited assignment rights at the tenants' sole discretion, with successor assignees retaining rights to further unlimited assignment, without requiring the owner's consent (Clause C); and unrestricted rights to occupy these apartments as occasional residences, with complete immunity from any default claim by the landlord arising by reason of nonprimary occupancy (Clause E).

The landlord's complaints in these actions seek (1) a declaration that the subject apartments are not primary residences of these tenants, (2) ejectment of the tenants, (3) a declaration that the cited "sweetheart" provisions of the leases are void or voidable under applicable law, and (4) damages and attorneys' fees. After joinder of issue, the tenants moved for summary judgment dismissing the complaints, and the landlord cross-moved, in *Rima 106, L.P. v Alvarez*, for summary judgment on its third cause of action for declaratory relief. The IAS Court granted the tenants' motions and dismissed both actions on the ground that plaintiff took title to the premises subject to all the terms and conditions of the leases as a matter of law. On renewal and reargument, wherein plaintiff indicated an intention to seek leave to amend its complaints to include, *inter alia*, a new claim that the leases were voidable as violative of sections 273 and 276 of the Debtor and Creditor Law, the court denied the motions in their entirety, ruling that nothing in the Rent Stabilization Code barred a landlord from waiving the provisions of the Code.

We reverse the dismissal of the declaratory claims, concluding that the motion court erred in its analysis. Defendants' motions to dismiss the complaints are denied. Furthermore, we grant summary judgment to plaintiff on its third cause of action, declaring that Clauses B, C and E of the riders to the leases are null and void as violative of public policy and the rent control and stabilization statutes and code. The balance of each action, regarding use and occupancy and attorneys' fees, presents triable issues of fact which require further proceedings.

These residential apartment leases represent a truly extraordinary form of conveyance which, if enforceable, might carry advantages greater than a life estate or even an estate in fee simple, escaping the burdens of taxation, recordation and remainder interests. Although the stated term of each lease is one year, its actual life is coextensive with a perpetual right of renewal so long as the rent stabilization laws remain unchanged. This is indeed a novel creature of real property ownership, spawned by a mating of the rent stabilization law with an insolvent corporate building owner. One should pause a moment to marvel at such a tenurial hippogriff whose continued existence would violate the fundamental policies and purposes of the statutory rent regulation scheme.

### 1. Unlimited Right to Sublet and Assign

The interplay of the three rider clauses, permitting nonprimary occupancy by the tenants, coupled with the unlimited right of tenants to assign and/or sublet, is in direct violation of section 226-b of the Real Property Law, which was expressly enacted to meet the continuing public emergency in housing. The Legislature therein recognized (L 1983, ch 403, § 1) that "severe disruption of the rental housing market is threatened as a result of the present state of the law and judicial decisions in relation to the rights of tenants to sublet or to assign leases. The situation, in addition to creating widespread uncertainty on the part of all parties as to their rights, has permitted speculative and profiteering practices on the part of certain holders of apartment leases, leaving many subtenants without protection and removing many housing accommodations from the normal open housing market." The IAS decision, if permitted to stand, would thus eviscerate 16 years of legislative policy directed at relieving the housing shortage emergency.

Real Property Law § 226-b (4) acknowledges that apartments subject to the Rent Stabilization Law (RSL) are already protected by substantial subletting restrictions. As relevant herein, RSL (Administrative Code of City of NY) § 26-511 (c) (12) (b) and (f) respectively require a tenant seeking to sublet to "establish that at all times he or she has maintained the unit as his or her primary residence and intends to occupy it as such at the expiration of the sublease;" and "not sublet the unit for more than a total of two years, including the term of the proposed sublease, out of the four-year period preceding the termination date of the proposed sublease." Real Property Law § 226-b (5) and (6) further provide that any sublease or assignment not in compliance with this law is not only a substantial breach of the lease, but is "null and void." The free-assignment clause thus confers benefits in direct violation of the constraints contained in the Real Property Law. Nor is it the purpose of the Rent Stabilization Law to create a class of mini-landlords who can profiteer in housing units placed under the law's protection. These lease provisions are void for illegality.

### 2. Nonprimary Occupancy Clause

In *Cier Indus. Co. v Hessen* (136 AD2d 145, 150), this Court reviewed the public policy considerations of rent regulations with respect to requirements for primary occupancy, noting that "one of the basic and most significant components of the

Rent Stabilization Law is its application only to premises used as the primary residence of the tenant [citations omitted]. A tenant of a stabilized apartment who maintains a primary residence elsewhere, and also seeks to retain the stabilized apartment for convenience or for considerations of personal gain, is not one who is a victim of the housing crisis but may rather be said to be a contributing and exacerbating factor in the continuation of the critical shortage of affordable apartments. The aims of the Rent Stabilization Law are better served when such occupancy is discouraged". (*See also, Briar Hill Apts. Co. v Teperman*, 165 AD2d 519, 523.) Facing foreclosure, plaintiff's predecessor landlord may have been interested solely in conducting a "fire sale" of its only assets, possibly in fraud of its mortgagee and other creditors, ignoring the fact that such a transaction injures the public by removing affordable housing from the market. (*See*, Mollen, Realty Law Digest, *Foreclosures—Receiver—Lease Concessions Allegedly Made Before Foreclosure—Improper Assignment of Rent—Impairment of Mortgagee's Rights—Fraudulent, Collusive Leases*, NYLJ, May 25, 1994, at 5, col 1.) Under the circumstances, any such waiver was contrary to public policy, and must be declared a nullity.

### 3. Landlord's Fraudulent Conveyance Claim

■ Plaintiff indicates a desire to amend its pleadings to add a claim that the Clark and Alvarez leases were actually signed after the notice of pendency was filed on January 22, 1987, despite the fact that they are dated "as of July 1, 1985" and "as of January 1, 1987", respectively. If this were true, the leases could be voidable as fraudulent conveyances pursuant to Debtor and Creditor Law §§ 273 and 276 (*West 56th & 57th St. Corp. v Pearl*, 242 AD2d 508).

However, this claim was raised for the first time in plaintiff's motion to renew and reargue, four months after the complaint was dismissed. No appeal lies from the denial of reargument (*Nitec Paper Corp. v Carborundum Co.*, 73 AD2d 881, 883, *lv dismissed* 49 NY2d 708). The IAS Court properly denied the motion to renew because it was not predicated on newly discovered material facts (*Rubinstein v Goldman*, 225 AD2d 328, *lv denied* 88 NY2d 815).

### 4. Tenants' Claims and Equities

■ That this landlord has become the "beamish boy" to slay the hippogriff does not mean that these tenants must be extirpated from their leasehold premises. The leases remain

valid at this juncture, subject to the landlord's proofs at trial of a basis for ejectment at law. Also, we do not foreclose the possibility that defendants, on this record, may themselves have equities arising from the substantial renovations they made to these apartments to render them habitable. Furthermore, tenant Clark's daughter, Melissa Stein, the present occupant, may be in a position to establish a valid succession in her own right, under Public Housing Law § 14 (4) (a). These are issues of fact that preclude summary judgment on the cause of action for ejectment. Even though ejectment is an action at law, there should be, in the context of this declaratory judgment action whose essence is reformation, a panoply of equitable relief available to all parties. (*See*, Siegel, McKinney's Cons Laws of NY, Book 7B, CPLR Practice Commentaries, C3001:16.)

Accordingly, the orders and judgments (one paper each) of Supreme Court, New York County (Leland DeGrasse, J.), respectively entered August 7 and June 10, 1997, which, in actions for ejectment and related declaratory and monetary relief based on claims of nonprimary residence, granted defendants' motions for summary judgment with attorneys' fees, declared that plaintiff is fully bound by the leases entered into between its predecessor in title and defendants, and, in *Rima 106, L.P. v Alvarez*, denied plaintiff's cross motion for summary judgment on its third cause of action, should be reversed, on the law, without costs, defendants' motions denied, and plaintiff's cross motion for partial summary judgment in *Rima 106, L.P. v Alvarez* granted (and similar relief granted, *sua sponte*, to plaintiff in *Rima 106, L.P. v Clark*, upon search of the record), declaring that the three rider clauses (B, C and E) are void and unenforceable. The fourth and fifth causes of action should be severed and remanded for further proceedings. Appeals from the orders of the same court and Justice, entered March 19 and 25, 1998, which denied plaintiff's motions to renew, should be dismissed, without costs, as academic.

ELLERIN, P. J., ROSENBERGER and SAXE, JJ., concur.

Orders and judgments (one paper each), Supreme Court, New York County, entered August 7, 1997 and June 10, 1997, reversed, on the law, without costs, defendants' motions for summary judgment with attorneys' fees denied, and plaintiff's cross motion for summary judgment in *Rima 106, L.P. v Alvarez* granted (and similar relief granted, *sua sponte*, to plaintiff in *Rima 106, L.P. v Clark*, upon search of the record), declaring that the three rider clauses (B, C and E) are void and unenforceable, and the fourth and fifth causes of action severed

and remanded for further proceedings. Appeals from orders, same court, entered on or about March 19, 1998 and March 25, 1998, dismissed, without costs, as academic.