[814 NYS2d 43]

John H. Drucker et al., Respondents, v John T. Mauro, Appellant.

First Department, April 20, 2006

## APPEARANCES OF COUNSEL

*Finkelstein Newman LLP*, New York City (*Barry Gottlieb* and *Lucas A. Ferrara* of counsel), for appellant.

*Irwin, Lewin, Cohn & Lewin, P.C.*, New York City (*Edward Cohn* of counsel), for respondents.

## OPINION OF THE COURT

Tom, J.P.

At issue on this appeal is whether plaintiff tenants can enforce a lease and rider incorporating the terms of a stipulated settlement agreement that, while not in compliance with the provisions of the Rent Stabilization Law, is favorable to the tenants' interests. In keeping with well-established precedent, this Court holds that an agreement in purported or actual settlement of a landlord-tenant dispute which waives the benefit of a statutory protection is unenforceable as a matter of public policy, even if it benefits the tenant.

In November 1981, plaintiffs John and Jacqueline Drucker entered into a rent-stabilized lease for apartment 2 at 432 East 58th Street in Manhattan. The lease was renewed on a number of occasions prior to defendant landlord's acquisition of the building in 1991, at which time plaintiffs' lease term was to expire on October 31, 1992. In January 1992, landlord filed an application with the Division of Housing and Community Renewal (DHCR) seeking a determination that the apartment was not subject to rent stabilization.

By statute, landlord was required to offer plaintiffs a renewal lease effective November 1, 1992 (Rent Stabilization Code [9 NYCRR] § 2523.5). Instead, plaintiffs assert, the parties entered into extensive negotiations with respect to "the rent regulated status of the building . . . repairs and renovations that had been made; and the right to certain personal property in the Apartment." The parties reached a settlement of the disputed items, which agreement was incorporated into the rider to the lease commencing March 1, 1995. The rider provides for payment of rent at a rate ($1,700 a month) concededly exceeding the lawful regulated rent established for the premises ($1,529 a month). In February 1996, DHCR issued a determination declaring the premises subject to the Rent Stabilization Law. Thus,

the apartment was subject to the statute at the time the parties entered into the disputed lease and rider.

The 1995 lease rider also provides, inter alia, for automatic renewal, in perpetuity, for successive two-year terms with a rent increase equal to the percentage authorized by the New York City Rent Guidelines Board. The lease was last renewed in November 2000. In April 2002, landlord sent plaintiffs a DHCR income certification form because the rent exceeded $2,000 a month. Rather than respond, plaintiffs commenced this action seeking a declaration that they are not required to respond and that the parties are bound by the 1995 lease as well as a preliminary and permanent injunction barring landlord from seeking luxury deregulation of the apartment. When the preliminary injunction was denied, landlord sought and obtained a ruling from DHCR deregulating the apartment based on luxury decontrol.* Subsequently, Supreme Court declared the 1995 lease and rider to be enforceable.

It is well settled that the parties to a lease governing a rent-stabilized apartment cannot, by agreement, incorporate terms that compromise the integrity and enforcement of the Rent Stabilization Law. Any lease provision that subverts a protection afforded by the rent stabilization scheme is not merely voidable, but void (Rent Stabilization Code [9 NYCRR] § 2520.13), and this Court has uniformly thwarted attempts, whether by mutual consent or by contract of adhesion, to circumvent regulated rent maximums (see *Draper v Georgia Props.*, 94 NY2d 809 [1999] [nonprimary residence]; *390 W. End Assoc. v Harel,* 298 AD2d 11 [2002] [consent judgment]; *390 W. End Assoc. v Baron,* 274 AD2d 330 [2000] [same]; *Abright v Shapiro,* 214 AD2d 496 [1995] [residential space leased for professional purposes]; *Matter of Yanni v New York State Div. of Hous. & Community Renewal,* 194 AD2d 375 [1993], *lv denied* 82 NY2d 662 [1993] [residential premises leased in corporate name]; *Bruenn v Cole,* 165 AD2d 443 [1991] [illusory tenancy]).

To permit a landlord to exceed the legal regulated rent on the flimsy premise that a negotiated lease represents the settlement of a dispute with a tenant would invite ready circumvention of the regulatory scheme through selective invalidation of provisions of the Rent Stabilization Law, severely compromising the

---

* DHCR deregulated the apartment on October 31, 2003 on the grounds that the rent exceeded $2,000 a month and that plaintiffs' household income exceeded $175,000 for each of the preceding two years. No administrative appeal has been taken from that determination.

protection it was intended to afford and eventually eviscerating the entire rent stabilization scheme. The pervasive policy of the statute is to provide an adequate supply of affordable housing in the City of New York (*390 W. End Assoc. v Baron*, 274 AD2d at 332). "The central, underlying purpose of the [Rent Stabilization Law] is to ameliorate the dislocations and risk of widespread lack of suitable dwellings" (*Manocherian v Lenox Hill Hosp.*, 84 NY2d 385, 395 [1994], *cert denied* 514 US 1109 [1995]). Central to the statutory scheme is preventing the exaction of excessive rents by landlords (*Estro Chem. Co. v Falk*, 303 NY 83, 87 [1951] ["The obtaining of excessive rents strikes at the very purpose of the act"]).

The prohibition against avoiding, by agreement, protection afforded by the rent stabilization scheme could not be stated more plainly. Rent Stabilization Code (9 NYCRR) § 2520.13 provides: "An agreement by the tenant to waive the benefit of any provision of the [Rent Stabilization Law] or this Code is void." Here, the tenants waived the protection afforded by the lawful stabilized rent established for their apartment and their right to timely renewal of their lease, a sufficient basis for voiding the agreement.

Permitting parties to a rent-stabilized lease to stipulate to a rent that exceeds the statutory lawful regulated amount can adversely affect both the legal rent and the regulated status of the dwelling unit for future occupants. For example, a landlord who can extract an unlawful rent for a sufficiently long period of time may be able to establish the stabilized rent at the unlawful level, to the detriment of a future tenant. This is so because the courts are generally prohibited from examining the rental history of an apartment beyond a four-year period (CPLR 213-a; *see Thornton v Baron*, 5 NY3d 175 [2005]). Thus, an illegal agreement can result in a future tenant having to pay more than the legal stabilized rent for a unit, a prospect which militates in favor of voiding agreements such as this in order to prevent abuse and promote enforcement of lawful regulated rents.

The result of the enhanced rent paid by plaintiffs herein has been to prematurely subject the premises to luxury decontrol. Anomalously, the intended effect of the lease rider is to permanently remove the apartment from the operation of the Rent Stabilization Law's luxury decontrol provision, in violation of express statutory language deregulating affected units (*see Matter of Dworman v New York State Div. of Hous. & Com-*

*munity Renewal,* 94 NY2d 359, 365 [1999]). Simply, enforcement of the lease and rider would preclude luxury decontrol of the unit, even after the rent exceeds $2,000, because landlord can only charge the rent provided in the agreement, not fair market value, in perpetuity.

That it is the tenants who seek to gain advantage by enforcing the unlawful lease provision to evade the operation of the law and regulations is of no moment. Tenants herein argue that, under the 1995 lease rider, they are entitled to automatic lease renewals with annual rent increases as set by the Rent Guidelines Board for as long as they occupy the premises without subjecting the premises to luxury decontrol. Were the intent of Rent Stabilization Code § 2520.13 to permit the tenant to avoid an agreement waiving statutory protection at his option, the regulatory language would undoubtedly so state. Instead, it simply provides that such agreements are "void" as a matter of public policy (*see Matter of Missionary Sisters of Sacred Heart, Ill. v New York State Div. of Hous. & Community Renewal,* 283 AD2d 284, 287 [2001]). As noted in *390 W. End Assoc. v Harel* (298 AD2d at 16):

> "The point is not to protect just a tenant, but to ensure the viability of the rent regulation system which protects tenancies in general, provides predictability to landlords, and significantly enhances the social, economic and demographic stability of New York City. Regardless of whether the tenant or the landlord makes the overture, we have developed consistent decisional law, in furtherance of this explicit policy, of prohibiting landlords and tenants from making private agreements to effectively deregulate applicable housing units."

A tenant cannot avoid this policy "by the expedient of entering private agreements purporting to take a lease out of the rent regulation schema" (*id.*) even if the particular agreement is the product of a stipulated settlement (*Cvetichanin v Trapezoid Land Co.,* 180 AD2d 503, 504 [1992], *lv dismissed* 79 NY2d 933 [1992] [consent judgment]; *see also 390 W. End Assoc. v Baron,* 274 AD2d 330 [2000], *supra* [same]). Fairness requires that the Rent Stabilization Law be applied impartially. This Court has made it clear that a tenant may not avail himself of the advantages of the statute when it furthers his interests and decline to be bound by the statutory scheme when it proves detrimental to those interests (*see Avon Bard Co. v Aquarian Found.,* 260 AD2d 207, 212 [1999], *appeal dismissed* 93 NY2d 998 [1999]).

That both parties to this dispute may have derived a benefit under the subject lease by avoiding the effect of various provisions of the statute does not afford a basis for affirmance. Supreme Court's disposition of this matter is indefensible because it enforces an illegal lease, in violation of the well-established judicial policy of refusing to enforce agreements that are unlawful or injurious to the public, particularly where an attempt to circumvent the Rent Stabilization Law is concerned (*Abright v Shapiro, supra*).

The disposition urged by the dissenters would, in effect, permit parties to a rent-stabilized lease to contract out of rent stabilization and circumvent regulated rent maximums, which "strikes at the very purpose" of rent regulation (*Estro Chem. Co.*, 303 NY at 87). Such a ruling would not only conflict with precedents of this Court but would erode the entire statutory scheme of the Rent Stabilization Law, which was primarily designed to provide landlords in the City of New York with a reasonable return on their investment and tenants with affordable housing during an emergency shortage of such accommodations.

Quite apart from any impact of this Court's decision on the immediate parties, there is the far greater concern for its impact on the enforcement of the Rent Stabilization Law. If the parties to a stabilized lease are free to pick and choose, by agreement, those aspects of the regulatory scheme to which they will adhere and those they will avoid, the salutary effect of the statute will be frustrated. It is significant that the pretense for the parties' insertion of the lease rider is that the unlawful increase over the stabilized rent was agreed to in settlement of a dispute involving the amount owed to landlord because of certain improvements, renovations or repairs to the apartment.

Disputes involving the physical condition of a dwelling unit are commonplace in the housing parts. Thus, if this Court condones the modification of a lease in abrogation of statutory mandates, there will be no shortage of opportunities for parties to claim that they acted in good faith, in furtherance of a negotiated settlement, rather than with an intent to circumvent rent regulations. A particular lease might be drafted to provide for an increase in rent for improvements made or, alternatively, for a decrease in rent for repairs not made, in one instance avoiding the established stabilized rent (*see Draper v Georgia Props., supra*) and, in the other, avoiding the obligation to maintain the premises in good repair (Multiple Dwelling Law § 78; *see Garcia*

*v Dormitory Auth. of State of N.Y.*, 195 AD2d 288 [1993]). Either way, the effect will be to nullify the protection afforded by the statute. Finally, the judicial interest in promoting settlements (*see Mitchell v New York Hosp.*, 61 NY2d 208, 214 [1984]) is not implicated where, as here, the disputed provision incorporating the settlement is void as a matter of public policy.

Accordingly, the order of the Supreme Court, New York County (Barbara R. Kapnick, J.), entered March 8, 2004, which granted plaintiffs' motion for summary judgment declaring that the lease and rider executed by the parties were enforceable and which denied defendant landlord's cross motion for summary judgment seeking to declare article 2 of the rider to be unenforceable and to rescind said provision, should be reversed, on the law, without costs, the motion denied and the cross motion granted, and article 2 of the subject lease rider declared unenforceable.

ANDRIAS, J. (dissenting). On March 1, 1995, the parties to a rent-stabilized lease entered into a renewal lease with a rider. As pertinent to this appeal, article 2 of the rider provides that plaintiffs are entitled in perpetuity to automatic two-year renewal leases with rent increases to be fixed according to the percentages periodically set by the New York City Rent Guidelines Board. The issue presented is whether the parties' agreement is void as against public policy because it effectively deregulated the apartment.

The majority concludes that the parties' agreement was an attempt to circumvent the rent stabilization laws because plaintiffs agreed to pay $1,700 a month in rent whereas their rent under the expiring lease was $1,529 and the lawful increase for 1994 to 1996 would have been $1,590 instead of the $1,700 agreed to by the parties. Overlooked, however, is the fact that, as found by the motion court, and specifically set forth in the agreement itself, the lease and rider were the culmination of extensive, arm's length negotiations to settle a dispute arising out of defendant's alleged failure to timely offer plaintiffs a renewal lease as well as outstanding claims involving the rent, repairs and renovations to the apartment and certain appliances in the apartment.

The parties specified in the rider that the lease and rider incorporated and constituted a settlement regarding approximately $6,676 in costs and expenses relating to various renovations made to the apartment in 1992. Article 6 of the rider provides, in pertinent part, that "[t]he agreed Base Rent

provided for under the Lease incorporates any amounts to which Landlord may otherwise have been entitled with regard to the cost and expense relating to the foregoing . . . and no additional amounts will be payable to the Landlord with regard to the foregoing."

Unless public policy is affronted, settlements are favored and encouraged and, absent any evidence of bad faith or overreaching, I perceive no basis for disturbing the parties' arm's length agreement (*cf. Merwest Realty Corp. v Prager*, 264 AD2d 313 [1999]) or declaring article 2 of the rider unenforceable as against public policy.

The lease and rider were entered into at a time when there was a pending application by defendant to the Division of Housing and Community Renewal (DHCR) for a determination that the apartment was not subject to rent stabilization because the building contained fewer than six apartments. A year later, DHCR denied defendant's application. Thus, the apartment continued to be rent stabilized and plaintiffs' lease was renewed in 1996, 1998 and 2000, and the rent increased, pursuant to the terms of the rider, in accordance with the percentages permitted by the Rent Guidelines Board. Thereafter, in 2002, after the rent on plaintiffs' apartment was more than $2,000, defendant sought luxury decontrol of the apartment and, in response, plaintiffs commenced this action, which seeks a declaration that the lease and rider are enforceable and an injunction barring defendant from applying for luxury decontrol, and moved for summary judgment. Defendant cross-moved for summary judgment granting him luxury deregulation of the apartment and declaring article 2 of the rider unenforceable and contrary to public policy.

The motion court granted that portion of plaintiffs' motion for summary judgment declaring the parties' lease and rider enforceable. In so ruling, the court found that defendant failed to cite any authority for the proposition that the Rent Stabilization Code would bar the parties from contractually agreeing to abide by certain provisions of the Code even if the premises are not otherwise subject to regulation or, as in the instant case, the premises become deregulated through "regular, officially authorized means." It further found that no public policy is implicated in the enforcement of such a contract and held that the lease and rider, including plaintiffs' right under article 2 of the rider to renewal leases for two-year terms with increases in accordance with the increases set by the Rent Guidelines Board, are

enforceable and remain in effect notwithstanding the luxury deregulation of the premises.

Initially, defendant's argument that article 2 of the rider is unenforceable as being violative of public policy since it required plaintiffs to pay rents higher than the lawful rent-stabilized rent on the apartment at the time is raised for the first time on appeal and should not be considered (*see District Council 37, Am. Fedn. of State, County & Mun. Empls., AFL-CIO v City of New York,* 22 AD3d 279, 284 [2005]; *Devlin v Video Servs. Acquisition,* 188 AD2d 370 [1992]). In any event, aside from being contrary to defendant's position below, where he contended that he was entitled to raise the rent based on renovations to the apartment, such argument is without merit.

The issue framed by defendant in his cross motion for summary judgment was whether a lease provision entitling plaintiffs to an unconditional renewal lease "in perpetuity" is enforceable and whether such provision exempts plaintiffs from "luxury deregulation." His position was not that the rider was void because plaintiffs waived *their* rights, but that nothing in the rider waived *his* right to apply to DHCR for luxury deregulation.

Although it is well settled that landlords and tenants are prohibited, on public policy grounds, from making private agreements to effectively deregulate rent-stabilized housing units (*see 390 W. End Assoc. v Harel,* 298 AD2d 11, 16 [2002]), as the motion court correctly found, no violation of public policy is implicated in the enforcement of the parties' agreement inasmuch as nothing in the agreement explicitly or implicitly deregulated the apartment in question. The motion court specifically found that the issue of whether the apartment should be luxury decontrolled is a question for DHCR and, in fact, while the cross motions were pending before the court, DHCR granted defendant's application and luxury decontrolled the apartment on October 31, 2003.

Thus, the apartment having been deregulated, not by the parties' agreement but by DHCR, the only question remaining before the motion court was whether the landlord of a previously rent-stabilized apartment may agree to offer his or her tenant renewal leases in perpetuity with rent increases that coincide with the amount of rent increases set by the Rent Guidelines Board for apartments that are still subject to rent stabilization.

Contrary to the majority's opinion, there is simply nothing in the rider to the parties' lease that indicates a waiver by the

plaintiffs of any protection offered by the lawful stabilized rent established for their apartment and their right to timely renewal of their lease. In fact, the lease has been renewed and its terms ratified by the defendant three times (1996, 1998 and 2000) prior to the commencement of this action.

Moreover, even if the provision for increased rent were found to violate the rent stabilization laws or offend public policy, the other terms of the lease and rider would still be enforceable since paragraph 18 of the lease contains the standard proviso that "[i]f a term in this Lease is illegal, the rest of this lease remains in full force."

The immediate threat to the rent stabilization scheme perceived by the majority of wholesale use by other parties of such settlement agreements as a subterfuge to abrogate regulatory controls and its argument that there is no reason to depart from established policy in this case is unpersuasive. It is well settled that landlords and tenants are prohibited, on public policy grounds, from making private agreements to effectively deregulate rent-stabilized housing units. Nevertheless, despite a prohibition in the rent control law identical to Rent Stabilization Code (9 NYCRR) § 2520.13 (which provides: "An agreement by the tenant to waive the benefit of any provision of the [Rent Stabilization Law] or this Code is void"), this Court has twice upheld negotiated settlements surrendering possession of rent-controlled apartments where such settlements, as here, were freely negotiated at arm's length (*see Merwest Realty Corp. v Prager, supra*; *Eckstein v New York Univ.* 270 AD2d 208 [2000], *lv denied* 95 NY2d 760 [2000]; *see also Kent v Bedford Apts. Co.*, 237 AD2d 140 [1997]).

Nor is there any support for the majority's conclusion that a result of the enhanced rent, which clearly included the $6,676 amount agreed to by the parties as part of their settlement, has been to prematurely subject the premises to luxury decontrol. In fact, defendant argued before the motion court that, to the extent plaintiffs sought to challenge the rents set forth in the parties' 1995 lease, they were barred by the four-year statute of limitations in the Rent Regulation Reform Act of 1997 (L 1997, ch 116, § 34, amending CPLR 213-a) from challenging the registered rents for the apartment beyond May 1998, i.e., four years prior to the commencement of this action.

Likewise, the majority's fear that the higher rent presently paid by plaintiffs may result in a future tenant having to pay more than the legal stabilized rent for this unit is totally

unfounded. There is simply no question that the apartment in question has been luxury decontrolled by DHCR. Any future tenant will, as plaintiffs have already done, negotiate a fair market rent for the unit without recourse to the rent stabilization laws. While unlikely, if market conditions were to change, such fair market rent could conceivably be lower than its previous rent stabilized rate. Nor would an affirmance result in the widespread bad faith use of negotiated settlements in housing court. Presumably, any future disputes about similar settlements would have to be decided, as this one must, on their individual merits, which would necessitate, in addition to any legal analysis, consideration of such issues as good faith and credibility. There is no claim here that either party to this transaction acted in bad faith or that there was a collusive effort to avoid or abrogate the rent stabilization scheme.

Accordingly, since the parties' agreement, by its terms, clearly did not deregulate the apartment, I dissent and would affirm the order granting plaintiffs' motion for summary judgment declaring the lease and rider enforceable.

MAZZARELLI and GONZALEZ, JJ., concur with TOM, J.P.; ANDRIAS and FRIEDMAN, JJ., dissent in a separate opinion by ANDRIAS, J.

Order, Supreme Court, New York County, entered March 8, 2004, reversed, on the law, without costs, plaintiffs' motion for summary judgment declaring the lease and rider enforceable denied and defendant's cross motion seeking to declare article 2 of the subject lease rider unenforceable granted.