[45 NYS3d 84]

204 COLUMBIA HEIGHTS, LLC, Appellant-Respondent, v AN-
THONY MANHEIM, Respondent-Appellant.

First Department, January 19, 2017

## APPEARANCES OF COUNSEL

*Belkin Burden Wenig & Goldman, LLP*, New York City (*Magda L. Cruz, Sherwin Belkin, Robert A. Jacobs* and *Matthew Brett* of counsel), for appellant-respondent.

*Savona, D'Erasmo & Hyer, LLC*, New York City (*Joseph F.X. Savona* and *Raymond M. D'Erasmo* of counsel), for respondent-appellant.

**OPINION OF THE COURT**

TOM, J.P.

The central issue in these appeals concerns the validity of a 1975 lease agreement for three combined apartments that provided, inter alia, that the rent-regulated status of the combined unit would be changed from rent-controlled to rent-stabilized. While we do not depart from longstanding precedent holding that leases that attempt to circumvent the rent laws or remove an apartment from rent regulation are void as against public policy, statute, and code (*see Drucker v Mauro*, 30 AD3d 37 [1st Dept 2006], *appeal dismissed* 7 NY3d 844 [2006]; *390 W. End Assoc. v Harel*, 298 AD2d 11 [1st Dept 2002]; Rent Stabilization Code [9 NYCRR] § 2520.13; NY City Rent and Rehabilitation Law [Administrative Code of City of NY] § 26-412), we find the lease in this case, which explicitly contemplated the possibility that the apartment would not be decontrolled and expressly stated that the status of the apartment would be determined by the appropriate authority, which will bind the parties, to be valid.

In or about 1963, defendant moved into apartment 4B at 204 Columbia Heights, Brooklyn, as a rent-controlled tenant. In 1966, he also rented apartment 4C. He obtained permission from his then-landlord, nonparty Columbia Terrace, Inc., to combine apartments 4B and 4C and make certain improvements, such as installing a shower/sauna in place of one of the bathrooms.

When apartment 4A became vacant, defendant desired to rent it so that he could eventually combine it with apartments 4B-C. However, because the landlord had a couple ready to rent the apartment, it was agreed that defendant would be the prime tenant for that apartment and the couple would sublet the unit and actually live in it.

Although defendant continued to have subtenants in apartment 4A through 1975, at that point he was ready to combine all three apartments. Accordingly, by a lease dated as of September 1, 1975 but not executed until July 19, 1977, Columbia Terrace agreed to rent apartments 4A-C to defendant from September 1, 1975 to August 31, 1977 for $650 per month, with an option to renew for an additional three years. The printed (form) part of the lease says the following about repairs:

> "Tenant shall take good care of the demised premises . . . [A]t Tenant's own cost and expense, Ten-

ant shall make all repairs thereto and to any other part of the building which are necessitated by the misuse, negligence, carelessness, neglect or improper conduct of Tenant [or] Tenant's family . . . . If Tenant fails to proceed to make such repairs . . . within 7 days after notice from Landlord, . . . the same may be made by Landlord at the expense of Tenant and the cost thereof shall be collectible as additional rent."

The printed part of the lease also contains the following attorneys' fee provision:

"If tenant shall default in the observation or performance of any term or covenant on tenant's part to be observed or performed . . . , landlord may . . . perform the obligation of tenant . . . . [I]f landlord, in connection therewith . . . , makes any expenditures or incurs any obligations for the payment of money, including . . . attorney's fees, in instituting, prosecuting or defending any action or proceeding, such sums so paid or obligations incurred . . . shall be deemed to be additional rent hereunder."

A typewritten rider to the lease shows that it was contemplated that apartments 4A-C would move from rent control to rent stabilization:

"[T]he provisions of this lease respecting length of term, renewal options and amount of rent, have been agreed upon . . . on the express understanding that the former three apartments comprising the area which is being leased to the Tenant . . . will be recognized by the appropriate authority having jurisdiction to be free of the restraints and limitations of the provisions of the Rent Control Laws . . . and to be subject only to the Rent Stabilization Act."

However, the parties also recognized that the entire apartment might not be decontrolled. After two paragraphs (30 [i] and [ii]) setting forth the rent for the renewal period if the premises were decontrolled, paragraph 30 (iii) states:

"[I]f . . . the parties are prohibited or precluded from following the procedure described under (i) or

(ii) . . . the rent will be determined by treating the unit as though (a) the separate decontrolled rent for former apartment 4A[1] . . . for the Basic Term [i.e., Sept. 1, 1975 - Aug. 31, 1977] is $270.00 per month and (b) the monthly rent for the Renewal Term for that former apartment 4A would be $270.00 plus the maximum allowable increase under Rent Stabilization . . . and (c) the rents for the former apartments 4B and 4C shall be equal to the maximum collectible rents that would be permitted . . . under the . . . rent control laws."

Paragraph 31 of the rider, titled "Tenant Improvements," explicitly provides defendant with permission to perform certain renovation and alteration work in the combined apartment, with the costs to be borne by defendant. That paragraph also says, "Landlord shall be under no obligation, of any kind, to make any repairs to any equipment, fixtures, furnishings, or facilities constructed, altered, [or] erected by the Tenant or installed by [him] . . . or any repairs made necessary by reason of [his] acts or omissions." Similarly, paragraph 33 says that after May 1975, "Tenant will . . . maintain all of [his] own installations without any obligation on the part of Landlord with respect thereto." Notwithstanding the foregoing, the landlord agreed to paint the apartment at three-year intervals.

Prior to the execution of the lease at issue, in September 1976, a District Rent Director found that "it appears that Apt. 4-A is decontrolled under Section 2f (17) of the regulations." Then, in January 1980, the District Rent Director of the Brooklyn District Rent Office decontrolled the entire apartment (4A-C). However, in April 1981, the Commissioner of the Department of Housing Preservation and Development (HPD) revoked the January 1980 order. In particular, the Commissioner determined that "[t]he fact that the tenant may not have had the full use of any of the former apartments while they were undergoing alteration did not constitute a vacating within the ambit of Section 2f (17) of the Regulations. The tenant continued in occupancy and the accommodation remained subject to control."

In addition, the Commissioner found, "[T]he maximum rent for the subject accommodation as of September 1, 1975, was $650 per month." In that regard, he noted,

---

1. Defendant "acknowledge[d] that former apartment 4A was decontrolled by reason of its having been vacated and having remained vacant between January and May, 1975."

> "Since there are no comparable units within the subject building and since the alteration was made after arms length negotiations and agreements were entered into between the tenant herein and the former landlord, . . . the lease executed by the parties is the best indicia of the rental value of the accommodation."

Both defendant and Brian Donovan, who had purchased the building in 1977, filed CPLR article 78 petitions with respect to the 1981 order. Supreme Court remitted the article 78 proceedings to the administrative agency and in November 1984, the Deputy Commissioner of the Division of Housing and Community Renewal (DHCR) found that defendant's protest regarding the amount of rent set in the 1981 order should be granted and the proceeding remanded to the District Rent Administrator. However, DHCR rejected the landlord's arguments about decontrol, saying:

> "The landlord contends that the present apartment should be decontrolled because it necessarily had to be vacated by the tenant while the alterations were being made, and, in addition, . . . the tenant agreed to such decontrol in the lease . . . [T]hese arguments [are] without merit.

> "If the tenant did temporarily have to live elsewhere during the alteration of the new unit, this is not such vacating as contemplated by the Rent Law.

> "As to the landlord's reliance on the agreement embodied in the lease, Section 2201.1b of the Rent Regulations . . . provides . . . that '. . . an agreement by the tenant to waive the benefit of any provision of the Rent Law or regulations is void.' "

In May 1985, the District Rent Administrator set the controlled maximum rent for the apartment. The Administrator

> "established the maximum rent on the basis of the . . . 'first' rent of $650 [set forth in the parties' lease] but . . . updated it to reflect annual Maximum Base Rent adjustments from 1976 through 1985 plus certain service increases resulting in a rent of $1,184.01 per month plus a $57.00 per month fuel cost adjustment."

Defendant appealed, but in a January 15, 1987 order DHCR affirmed the Administrator's order. In particular, DHCR said,

"It was reasonable for the District Rent Administrator to choose the 'first rent,' which reflects a straight forward [sic] opinion of what the parties thought the apartment was worth at the time, rather than any of the somewhat tortuous methods suggested by" defendant.

Although defendant appealed to the Second Department, he ultimately reached a settlement agreement with Donovan in December 1987, and thus withdrew his appeal. The agreement included provisions regarding the painting of the apartment.

In 1992, defendant and Donovan began having disputes regarding repairs and maintenance to defendant's apartment. In a series of letters, Donovan refused to reimburse defendant for work done on his shower-sauna or for his awnings. Donovan asserted that he was not legally required to pay for these items because defendant "installed [these] improvement[s] for your own use and benefit and you are responsible for its maintenance and repair." Defendant disagreed, replying, "Once installed, these permanent structural components are legally yours [the landlord's], as is the responsibility for their maintenance."

In October 2002, Donovan requested an advisory opinion from DHCR as to who is responsible for repair, maintenance and replacement of tenant improvements, fixtures or equipment. DHCR issued an opinion letter stating, "Where a tenant installs his or her own fixtures and equipment, the responsibility to maintain or repair such items rests exclusively with that tenant until his or her vacatur." However, DHCR stressed, "[T]his opinion letter is not a substitute for a formal agency order issued upon prior notice to all parties and with all parties having been afforded an opportunity to be heard."[2]

On October 31, 2013, a section of the bathroom ceiling of apartment 3C fell due to water damage. Plaintiff maintains that the water damage was caused by defendant's shower in apartment 4C while defendant maintains that it was caused by a clogged and/or defective drain pipe.

Plaintiff commenced this action in 2013. In the first two causes of action plaintiff sought a declaration that defendant "has an obligation to make repairs in his Apartment concerning improvements made by him or damage to the building" and an injunction "compelling Defendant to make all repairs concerning improvements made by him or damage to the building . . . and uphold his obligations under the Lease." The third

---

2. In July 2010, Brian Donovan sold the building to plaintiff.

cause of action, which seeks damages for the water leak, is not at issue on appeal. The fourth cause of action is for attorneys' fees.

In March 2014, plaintiff moved for summary judgment on its first cause of action for a declaratory judgment and its second cause of action for a permanent injunction. Defendant cross-moved for summary judgment dismissing this action. In particular, defendant asserted that the lease upon which plaintiff relied is void ab initio and unenforceable because it was an "improper attempt to decontrol" the apartment. Defendant also asserted that plaintiff's causes of action for declaratory relief and injunction should be denied as plaintiff has an adequate legal remedy.

Supreme Court denied both motions, finding that both parties failed to meet their respective burdens and that triable issues of fact precluded summary judgment being granted in either party's favor (2014 NY Slip Op 33811[U] [2014]).

Because neither side had presented any of the DHCR orders postdating 1981, defendant moved to renew his cross motion for summary judgment based on these orders. Defendant's counsel excused the failure to present these orders on the prior motion, saying "At the time that the underlying motions were made . . . , [he] believed that no appeal [had been] taken from" the 1981 order. Counsel noted he received the 1984 and 1987 orders in October 2015 from nonparty David Ng. Ng, who has "represented . . . defendant on a number of personal matters related to his landlord-tenant situation," affirmed that he "[r]ecently" discovered the 1984 order and 1987 stipulation.

Supreme Court denied defendant's motion to renew, holding that defendant "failed to present any 'new facts not offered on the prior motion that would change the prior determination'" and failed to provide a reasonable justification for the failure to present the proffered evidence on the prior motion (2016 NY Slip Op 32623[U] [2016]).

On these appeals, defendant contends that the 1975 lease is void as against public policy because it tried to move his apartment from rent control to rent stabilization. Plaintiff, on the other hand, argues that Supreme Court should have granted it summary judgment and declared the lease and its repair and maintenance provisions valid.

We must begin by once again reiterating that "parties to a lease governing a [rent-regulated] apartment cannot, by agree-

ment, incorporate terms that compromise the integrity and enforcement of the Rent Stabilization Law [and Rent and Rehabilitation Law]" (*Drucker*, 30 AD3d at 39). For this reason, "this Court has uniformly thwarted attempts, whether by mutual consent or by contract of adhesion, to circumvent regulated rent maximums" (*id*; *see Georgia Props., Inc. v Dalsimer*, 39 AD3d 332, 333 [1st Dept 2007] [landlord and tenant stipulated that apartment would be permanently deregulated and that an office lease—as opposed to a residential lease— would be signed]; *390 W. End Assoc. v Harel*, 298 AD2d 11 [1st Dept 2002] [consent judgment]; *390 W. End Assoc. v Baron*, 274 AD2d 330 [1st Dept 2000] [same]; *Draper v Georgia Props.*, 230 AD2d 455 [1st Dept 1997], *affd* 94 NY2d 809 [1999] [nonprimary residence]; *Abright v Shapiro*, 214 AD2d 496 [1st Dept 1995] [residential space leased for professional purposes]; *Matter of Yanni v New York State Div. of Hous. & Community Renewal*, 194 AD2d 375 [1st Dept 1993], *lv denied* 82 NY2d 662 [1993] [residential premises leased in corporate name]; *Bruenn v Cole*, 165 AD2d 443 [1st Dept 1991] [illusory tenancy]; *Urban Assoc. v Hettinger*, 177 AD2d 439, 440 [1st Dept 1991], *lv denied* 79 NY2d 759 [1992] [landlord and tenant tried to deregulate apartment]).

We have previously explained that the prohibition against avoiding the rent stabilization scheme is stated plainly in the Rent Stabilization Code (*see Drucker*, 30 AD3d at 40). Rent Stabilization Code (9 NYCRR) § 2520.13 provides: "An agreement by the tenant to waive the benefit of any provision of the [Rent Stabilization Law] or this Code is void." Similarly, as pertains to rent-controlled apartments, the Rent and Rehabilitation Law is clear that

"[i]t shall be unlawful, regardless of any contract, lease or other obligation heretofore or hereafter entered into, for any person to demand or receive any rent for any housing accommodations in excess of the applicable maximum rent established therefor by the city rent agency or otherwise to do or omit to do any act, in violation of any regulation, order or requirement of the city rent agency under the state enabling act or under this chapter, or to offer, solicit, attempt or agree to do any of the foregoing" (Administrative Code of City of NY § 26-412 [a]).

Because "[a] policy of addressing the contemporary need to ensure an adequate supply of affordable housing retains a

continuing vitality" (*Harel*, 298 AD2d at 15), it remains essential to ensure that landlords not be permitted to "exceed the legal regulated rent on the flimsy premise that a negotiated lease represents the settlement of a dispute with a tenant" as this "would invite ready circumvention of the regulatory scheme through selective invalidation of provisions of the Rent Stabilization Law, severely compromising the protection it was intended to afford and eventually eviscerating the entire rent stabilization scheme" (*Drucker*, 30 AD3d at 39-40). Indeed, "[c]entral to the statutory scheme is preventing the exaction of excessive rents by landlords" (*Drucker*, 30 AD3d at 40). This is precisely why "deregulation is available only by statutorily specified means" (*Harel*, 298 AD2d at 15), and "not by private compact . . . a means expressly forbidden" (*Draper v Georgia Props.*, 94 NY2d at 811). As we have stated, "[A]n apartment cannot be deregulated by private contract" (*Baron*, 274 AD2d at 332). This is to further reinforce the policy of rent regulation which "is to provide an adequate supply of affordable housing in the City of New York" (*Drucker*, 30 AD3d at 40).

Nor can tenants evade the rent regulation laws "by the expedient of entering private agreements purporting to take a lease out of the rent regulation schema" (*Harel*, 298 AD2d at 16). Indeed, even where such leases inure to the benefit of the tenant we have invalidated them because the "point is not to protect just a tenant, but to ensure the viability of the rent regulation system which protects tenancies in general, provides predictability to landlords, and significantly enhances the social, economic and demographic stability of New York City" (*id.* at 16). In other words, these illegal leases present a serious threat to the viability of New York's rent regulation laws because they "affect both the legal rent and the regulated status of the dwelling unit for future occupants" (*Drucker*, 30 AD3d at 40). In sum, "[r]egardless of whether the tenant or the landlord makes the overture, we have developed consistent decisional law, in furtherance of this explicit policy, of prohibiting landlords and tenants from making private agreements to effectively deregulate applicable housing units" (*Harel*, 298 AD2d at 16).

■ While we do not waver from the strong public policy and this Court's consistent precedent in this area, we reject defendant's claim that the lease that he entered into with plaintiff's predecessor is void as against public policy. Unlike the leases invalidated in the foregoing cases, the subject lease did not

seek to completely deregulate the apartment (*see e.g. Georgia Props., Inc. v Dalsimer*, 39 AD3d 332 [landlord and tenant stipulated that apartment would be permanently deregulated and that an *office* lease—as opposed to a residential lease—would be signed]; *390 W. End Assoc. v Baron*, 274 AD2d 330, 331 [landlord and tenant stipulated that "apartment was exempted from the Rent Stabilization Law" because it was not primary residence]). Rather, the parties to this lease agreement who did not know the rent regulation status of this apartment merely tried to move the apartment from rent control to rent stabilization with certain concessions, and set out terms for such a transition, if possible.

More significantly, this case is clearly unique because unlike the many cases where we invalidated leases seeking to circumvent the rent laws, here the parties truly did not know the rent-regulated status of the combined apartments. It appears that there were two rent-controlled apartments that were combined with a rent-stabilized apartment sometime in 1977. Fundamentally, in the foregoing cases there was no uncertainty about the rent-regulated status of the apartments and no question that the parties knowingly attempted to circumvent the rent laws. In contrast, the parties in this matter were unsure about the status of the combined apartment. This confusion was well founded and even supported by the fact that the parties received conflicting determinations concerning the legal status of this apartment from rent administrators, HPD's Commissioner and DHCR regarding the apartment's status. Furthermore, the lease contemplated the possibility that the apartment could not be treated as intended by the parties. Indeed, while the lease provided for the combined apartments to move from rent control to rent stabilization, the parties explicitly recognized that they might be "prohibited or precluded" from enforcing their intended procedure. This is quite different from those leases which purposely sought to skirt the law and had no regard for the rent regulation scheme whatsoever. In other words, this agreement contemplated not that both parties would evade regulatory coverage but that they would seek approval of their agreement by the DHCR. Thus, this case is distinguishable from those involving leases which knowingly and purposely sought to evade the rent laws. Here, there was no intent by the parties to the lease agreement to circumvent the rent laws.

Relatedly, it is significant to note that following years of proceedings before the DHCR, the landlord complied with the

ultimate determination by DHCR that the apartment was not decontrolled and charged defendant the legal rent set forth by the rent administrator and DHCR. Accordingly, unlike those cases where we found the lease to be void as against public policy, here there was never any risk or intention to either completely deregulate the apartment or to circumvent regulated rent maximums.

Even assuming, arguendo, that the section of the lease trying to move the apartment from rent control to rent stabilization were void, the rest of the lease (including the paragraph requiring defendant to repair damage caused by him) would still be valid. In *Rima 106 v Alvarez* (257 AD2d 201 [1st Dept 1999]) we invalidated clauses which gave the tenants unlimited subletting and assignment rights and the right to occupy their apartments as nonprimary residences as "violative of public policy and the rent control and stabilization statutes and code," but we found the remainder of the leases to be valid (257 AD2d at 204, 206-207).

Nor can it be concluded that the main objective of this agreement was to illegally deregulate the apartment thereby voiding the entirety of the lease (*see Georgia Props*, 39 AD3d at 334). The lease here had multiple objectives, one of which was confirmation of the landlord's permission of defendant's renovation and alteration of apartments 4A-C.

Because we find the lease to be valid, we need not consider plaintiff's argument that defendant should be equitably estopped from denying the lease's enforceability. That claim is academic, and, in any event, unpreserved.

Plaintiff seeks a declaration that the lease provisions regarding defendant's obligation to repair and maintain improvements that he made to his apartment are enforceable. Since we find the lease to be valid and seek to eliminate or reduce future disputes between the parties, we modify to declare that the lease and rider provisions, with respect to defendant's obligation to repair and maintain tenant-made improvements and be responsible for resultant damages, if any, are valid and enforceable.

█ The second cause of action for a permanent injunction should have been dismissed because "plaintiff failed to establish that it does not have an adequate remedy at law, namely monetary damages" (*Mini Mint Inc. v Citigroup, Inc.*, 83 AD3d 596, 597 [1st Dept 2011]). Supreme Court's determination of the breach of contract claim will "sufficiently guide the

parties on their future performance of the contract[ ], thereby obviating any need for" other alternative relief (*Apple Records v Capitol Records*, 137 AD2d 50, 54 [1st Dept 1988]). Thus, we dismiss plaintiff's second cause of action seeking declaratory and injunctive relief.

With respect to the fourth cause of action (for attorneys' fees), defendant's only argument is that the lease containing that provision is void. Since we have ruled that the lease is valid, defendant's argument is unavailing.

█ Finally, Supreme Court providently exercised its discretion (*see Tishman Constr. Corp. of N.Y. v City of New York*, 280 AD2d 374, 377 [1st Dept 2001]) by denying defendant's motion to renew. He failed to show that the supposedly new evidence— documents dated 1984 and 1987—"could not with due diligence have been presented on the original motion" (*Wright v C.H. Martin of White Plains Rd., Inc.*, 23 AD3d 295, 296 [1st Dept 2005]). Defendant himself was a party to the administrative proceedings that led to the 1984 and 1987 orders of the DHCR and to the litigation that led to the 1987 stipulation. Under these circumstances, the DHCR orders and the stipulation did not constitute "new facts" within the meaning of CPLR 2221 (e) (2) (*see William P. Pahl Equip. Corp. v Kassis*, 182 AD2d 22, 27 [1st Dept 1992], *lv dismissed in part and denied in part* 80 NY2d 1005 [1992]). Nor would they "change the prior determination" (CPLR 2221 [e] [2]).

Accordingly, the order of the Supreme Court, New York County (Nancy M. Bannon, J.), entered November 6, 2014, which, to the extent appealed from as limited by the briefs, denied plaintiff's motion for summary judgment on its first cause of action and defendant's cross motion for summary judgment dismissing the first, second, and fourth causes of action, should be modified, on the law, to grant plaintiff's motion and declare that the lease and rider provisions, with respect to defendant's obligation to repair and maintain tenant-made improvements and be responsible for resultant damages, if any, are enforceable, and to grant the cross motion as to the second cause of action, and otherwise affirmed, without costs, and the order, same court and Justice, entered on or about February 24, 2016, which denied defendant's motion to renew, should be affirmed, without costs.

RENWICK, MANZANET-DANIELS, GISCHE and WEBBER, JJ., concur.

Order, Supreme Court, New York County, entered November 6, 2014, unanimously modified, on the law, to grant plaintiff's

motion and declare that the lease and rider provisions, with respect to defendant's obligation to repair and maintain tenant-made improvements and be responsible for resultant damages, if any, are enforceable, and to grant the cross motion as to the second cause of action, and otherwise affirmed without costs. Order, same court and Justice, entered on or about February 24, 2016, affirmed, without costs.