[744 NYS2d 412]

390 WEST END ASSOCIATES, Appellant, v EZRA HAREL, Respondent.

First Department, July 11, 2002

**APPEARANCES OF COUNSEL**

*Magda L. Cruz* of counsel (*Jay H. Berg* and *Howard Wenig* on the brief; *Belkin Burden Wenig & Goldman, LLP,* attorneys), for appellant.

*H. Richard Penn* of counsel (*Daniel J. Ansell* on the brief; *Greenberg Traurig, L.L.P.*, attorneys), for respondent.

**OPINION OF THE COURT**

Tom, J.

The lease at issue on this appeal is essentially the same as leases which we have previously held to be void ab initio as against public policy violative of Rent Stabilization Law; in furtherance of this policy we have even invalidated leases in the very building in question. Hence, consistent with those rulings, we must reverse the Supreme Court order and grant plaintiff's motion to vacate a prior consent judgment which deregulated the subject apartment.

The basic facts are undisputed. Defendant Ezra Harel holds Israeli citizenship and has resided there since 1988. In 1988, while preparing to purchase a Manhattan pied-a-terre, Harel met Milton Kestenberg, an attorney. Kestenberg subsequently represented Harel in the sale of his New Jersey home and then recommended that, rather than purchasing the condominium that Harel had selected, he should rent an apartment in the Apthorp, a building owned by plaintiff 390 West End Associates, in which Kestenberg was a general partner. Apparently, Kestenberg represented to Harel that he could enter a lease, renewable throughout his life as long as rental obligations were met, at a rent higher than that allowed by the Rent Stabilization Law but also favorable to Harel. This arrangement was to be conditioned on Harel not maintaining the apartment as his primary residence, a status purportedly effecting a deregulation of the apartment. Since Harel planned to reside in Israel, he was agreeable to this proposed occupancy status.

In September 1988, the parties entered into a lease for the subject apartment for a three-year term, commencing November 1, 1988 and terminating October 31, 1991, for a monthly rent of $2,000. Although this rent was much higher than what would have been the rent allowed under the rent guidelines (i.e., $1,035 per month), it apparently was significantly lower than what the rent could have been on the open market. The lease contained an expressed acknowledgment that Harel was not using the premises as his primary residence, and in fact specified his actual Israeli residence. The lease further acknowledged that as such the lease was exempt from rent regulation, and included the proviso that this rent status was contingent on the premises not being occupied as a primary residence. The lease otherwise paralleled the Rent Stabiliza-

tion Law and Code in other aspects, such as the detailed requirements ensuring renewal rights, and tied prospective rent increases on renewals to rates set forth in the rent stabilization guidelines. However, the tenant was precluded from assigning the lease or subletting. By these means, the landlord apparently sought to maintain as much harmony as possible with rent stabilization requirements except for the above legal base rent being charged and the nonsublet clause.

On September 28, 1988, plaintiff landlord commenced an action, seeking a declaratory judgment that the apartment was exempt from the Rent Stabilization Law by reason of Harel's nonprimary residence. The parties then entered into a stipulation on the same day which stated the parties' acknowledgment that the premises were exempt from coverage by the Rent Stabilization Law by reason of nonprimary residence and that the exemption would continue through subsequent leases between the parties. The consent judgment entered on November 1, 1988 thus manifested a judicial finding that Harel did not occupy the premises as his primary residence and that the apartment was exempt from rent stabilization. Harel assumed occupancy under the lease. His occupancy continued for several years apparently without dispute until last year when the landlord sought to avail itself of recent case law by this Court which, in the interim, had made clear that similar leases were invalid.

The landlord moved by order to show cause to vacate the consent judgment and rescind Harel's lease. It based the motion on this Court's then recent decision involving another apartment in the same building, *390 W. End Assoc. v Baron* (274 AD2d 330), which invalidated an arrangement "virtually identical to the one at bar." In *Baron*, the landlord (plaintiff herein) and tenant entered into a lease agreement which stated that the apartment was exempt from the Rent Stabilization Law due to the tenant maintaining his primary residence at an address in Frankfurt, Germany. The lease also prohibited subleasing to subtenants who would use the premises as a primary residence, provided for automatic renewals, and included a $2,400 monthly rent, for which the prior tenant had payed $507 per month. A consent decree was also subsequently entered declaring that the tenant was not maintaining a primary residence therein and that the apartment, as a consequence, was exempt from rent stabilization. The tenant subleased, for an even higher rent, to a third party who then used it as its primary residence. The subtenants then com-

menced a rent overcharge action against the tenant, contending that the tenant had created an illusory tenancy in order to evade the Rent Stabilization Law. Plaintiff landlord was not joined in that action. However, plaintiff landlord thereafter moved to vacate the consent judgment and rescind the lease so as to offer a rent stabilized lease to the occupant third party. We granted the landlord's motion and vacated the consent judgment on the basis that the lease between the parties was invalid ab initio.

In the present case, tenant cross-moves for a declaration, on public policy grounds, that the lease is void only insofar as it prohibited subleasing and that it is otherwise valid. Hence, both parties urge our consideration of public policy to reach a result beneficial to their own self-interest. However, the public policy we are constrained to observe and advance is solely that manifested in the statute and correlating regulations.

The motion court denied landlord's motion on the ground that it failed to establish a basis for vacating the consent judgment and rescinding the lease, and that a court had already determined that the apartment was exempt on nonprimary residence grounds. The tenant's cross motion was denied as moot. Plaintiff landlord appeals.

Our long-established public policy of preserving a moderate-priced housing stock in New York City, based on a legislative finding of an emergency shortage of affordable housing which exists up to the present, has been carefully codified in rent statutes and regulations, for which a comprehensive body of case law has evolved. This policy must be accorded primacy in the present dispute, which goes to the very heart of our rent stabilization scheme. To permit the enforcement of this lease agreement would essentially allow any landlord to evade rent regulations by the mere expedient of a private agreement. While that may work for the landlord and, as in this case, even for the tenant, it does not work for New York City's compelling need to control the availability of affordable housing stock. This principle must guide our analysis.

The Rent Stabilization Law of 1969 ([RSL] Administrative Code of City of NY § 26-501 *et seq.*) and the regulations promulgated thereunder as the Rent Stabilization Code impose exacting requirements in connection with the leasing of numerous housing units in New York City. These requirements include explicit limitations on rents that may be legally charged. As a corollary to charging only the legally enforceable rent, a landlord is entitled to require, inter alia, that the ten-

ant occupy the unit as a primary residence; if that condition is breached, then the tenant loses the entitlement of RSL rights, such as that of a renewal lease. There is no prohibition against denying RSL benefits to parties who do not need regulated apartments as primary residences. The present apartment undisputably is a unit governed by such rent regulation, and had been so before the parties entered the deregulated lease. The question is whether joint conduct by the landlord and tenant, by which the tenant does not occupy the unit as a primary residence, also entitles the landlord, in agreement with the tenant, to basically ignore legal rent guidelines and effectively deregulate the unit by private agreement under such arrangements. The underlying policy imperatives of rent regulation and specific statutory provisions compel a negative answer (*Cier Indus. Co. v Hessen*, 136 AD2d 145). Whether or not the tenant thus waives entitlement to a renewal lease has no bearing on whether the parties, acting together, can basically jettison the statutory scheme. Rather, deregulation is available only by statutorily specified means (RSL § 26-503), and "not by private compact as was attempted here—a means expressly forbidden" (*Draper v Georgia Props.*, 94 NY2d 809, 811). As we have stated, "an apartment cannot be deregulated by private contract" (*Baron, supra* at 332).

The original point of rent stabilization was to respond to a critical housing shortage in the aftermath of the Second World War (*Rent Stabilization Assn. v Higgins*, 83 NY2d 156, 164-165, *cert denied* 512 US 1213). A policy of addressing the contemporary need to ensure an adequate supply of affordable housing retains a continuing vitality (*390 W. End Assoc. v Baron, supra*), so as to "ameliorate the dislocations and risk of widespread lack of suitable dwellings" (*Manocherian v Lenox Hill Hosp.*, 84 NY2d 385, 395, *cert denied* 514 US 1109). Such a policy goal, it has long been recognized, could be undermined by a landlord's extraction of excessive rents, which "strikes at the very purpose" of rent regulation (*Estro Chem. Co. v Falk*, 303 NY 83, 87). Hence, an owner may not require "a tenant, prospective tenant or a prospective permanent tenant to represent or agree as a condition of renting a housing accommodation that the housing accommodation shall not be used as the tenant's or prospective tenant's primary residence, or the prospective permanent tenant's principal residence" (9 NYCRR 2525.3 [b]). Moreover, a landlord cannot use such a condition as a strategy for deregulating the apartment and thus charge a rent that exceeds the regulated rent. Here, as noted, the legal

rent on the apartment at the time of the initial lease agreement was $1,035 per month, while a monthly rent of $2,000 was charged under the lease.

Nor can a tenant, ostensibly the protected party, evade this policy by the expedient of entering private agreements purporting to take a lease out of the rent regulation schema. Rather, the Rent Stabilization Code emphatically makes clear that "[a]n agreement by the tenant to waive the benefit of any provision of the RSL or this Code is void" (9 NYCRR 2520.13) requiring invalidation, on public policy grounds, even of a tenant's settlement agreement (*Cvetichanin v Trapezoid Land Co.*, 180 AD2d 503, 504, *lv dismissed* 79 NY2d 933). As such, we have invalidated "sweetheart leases" that seek evasion of rent regulation requirements, even when such leases may be construed in a manner favorable to the tenants (*see, e.g., Rima 106 v Alvarez*, 257 AD2d 201). The point is not to protect just a tenant, but to ensure the viability of the rent regulation system which protects tenancies in general, provides predictability to landlords, and significantly enhances the social, economic and demographic stability of New York City. Regardless of whether the tenant or the landlord makes the overture, we have developed consistent decisional law, in furtherance of this explicit policy, of prohibiting landlords and tenants from making private agreements to effectively deregulate applicable housing units (*Urban Assoc. v Hettinger*, 177 AD2d 439, *lv denied* 79 NY2d 759; *Baron, supra; see also, Draper, supra*). As we stated in *Rima* (*supra* at 206), such a private transaction "injures the public by removing affordable housing from the market." The goal of ensuring an adequate supply of affordable housing "is frustrated when landlords and tenants attempt to contract around the regulated rent[s]" (*Baron, supra* at 332). In *Baron*, we relied on *Draper* to note that an agreement to waive the primary residence provisions of the RSL is void as against public policy, and have just as clearly stated that the creation of such illusory tenancies renders the agreement invalid and unenforceable, and permits vacatur of a consent judgment entered in connection therewith.

If we were to reach a contrary result and recognize the purported legality of the consent judgment in this case, we would not only act inconsistently with our own authority, we would also open the door to landlords and tenants privately agreeing to deregulate rent stabilized units, whether for their mutual advantage or plausibly at the landlord's behest, and to the indisputable diminution of the rent stabilization regime

that has clearly benefitted New York City for so many decades. Such a result is untenable.

The landlord articulates a willingness to enter a rent stabilized lease with the present defendant tenant predicated, though, on his maintaining a primary residence in that apartment. However, the rent for any renewal lease for this unit must be set in the amount of the legal stabilized rent at the time the parties entered the initial deregulated lease.

Accordingly, the order of the Supreme Court, New York County (Diane Lebedeff, J.), entered May 18, 2001, which denied plaintiff landlord's motion to vacate a 1988 consent judgment purporting to recognize and validate the nonprimary residence status of the subject apartment, should be reversed, on the law, without costs, and the motion granted.

WILLIAMS, P.J., MAZZARELLI, ROSENBERGER and ELLERIN, JJ., concur.

Order, Supreme Court, New York County, entered May 18, 2001, reversed, on the law, without costs, and plaintiff's motion to vacate a 1988 consent judgment purporting to recognize and validate the nonprimary residence status of the subject apartment granted.