[861 NYS2d 335]

TOA Construction Co., Inc., Appellant, v Michael Tsitsires, Respondent, et al., Respondents.

First Department, July 8, 2008

APPEARANCES OF COUNSEL

*Steven S. Sieratzki* and *Arnold Davis*, New York City, for appellant.

*Davis Polk & Wardwell*, New York City (*Kevin P. Hancock* and *Sarah S. McDonald* of counsel), for respondent.

### OPINION OF THE COURT

SAXE, J.

The laws of rent stabilization do not allow for the indefinite retention of the right to rent-stabilized premises by a tenant who does not actually reside in the premises and has no intent to return to reside there at any point in the future. This is no less true where, as here, the tenant's inability to ever reside there is caused by his mental illness. An apartment used by the tenant solely as a mail drop and storage space and occupied, when it is occupied at all, only by the tenant's companion, should not be treated as the tenant's residence. Unless there is evidence at trial supporting a conclusion that the tenant will at some point be able to actually reside in the apartment, his absence should not be deemed excusable, and his abandonment of the premises as his residence should be acknowledged as such.

The facts of this case were fully presented to the trial court, and that court's findings were not disputed, challenged, or altered by Appellate Term. Indeed, Appellate Term explicitly declined to second-guess either the trial court's assessment of credibility or its conclusion that respondent's mental illness prevented him from actively using the apartment. Although it reversed the trial court's holding, the reversal was based only upon the application of the law to the facts found by the trial court. Yet, our dissenting colleagues would make an entirely new set of findings, based upon their own assessment of the evidence, after rejecting consideration of certain materials upon

which they say the trial court improperly relied. Further, the dissent would rely upon materials entirely outside the record, including assertions contained in recent newspaper articles. We reject the implicit suggestion that we adopt the dissent's alternative assessment of the evidence instead of the trial court's assessment. Rather, we rely upon the previously undisturbed findings of the trial court, especially its rejection of respondent's testimony that he resided in the unit for extended periods of time during the *Golub* period (*see Golub v Frank*, 65 NY2d 900 [1985]).

The sad facts of this case, as found by the trial court, naturally incline one's sympathies toward respondent tenant, who suffers from debilitating mental illness that has propelled him into the life of a homeless person, despite his rights as a tenant in petitioner's deteriorating single-room occupancy (SRO) building. However, the tone employed by the dissent, accusing this Court of "facilitating a notorious slumlord's 20-year effort to empty its building of all tenants by evicting respondent tenant from his rent-stabilized apartment," is misguided. It is the responsibility of this Court to dispassionately apply the law to the facts as found, notwithstanding the well-intentioned impulse to protect the interests of a mentally ill individual or the desire to rule against the interests of a party characterized by newspapers as a "slumlord." It is incumbent upon us to correctly frame the rules of law that apply in this primary residence litigation. When the law is accurately stated, and applied neutrally to the facts as found by the trial court, it becomes clear that the findings of fact and conclusions of law of the trial court should have been upheld. We therefore reverse the order of Appellate Term, which, contrary to the ruling of the trial court, held that the tenant's extended absence from the subject premises was excusable and that he had not abandoned the tenancy.

This holdover proceeding to terminate respondent's tenancy, on the ground that the apartment was not his primary residence, was commenced on December 7, 2000, following the landlord's service on July 14, 2000 of a *Golub* notice of expiration of respondent's tenancy as of November 30, 2000.

Respondent has been a rent-stabilized tenant in the SRO since 1970. Over the years, the building fell into a state of chronic disrepair, and the trial court found the apartment to be uninhabitable when it inspected the premises on April 27, 2005. But, this litigation does not turn on the habitability of the apart-

ment, or even on the nefariousness of the landlord; it simply concerns whether petitioner established that respondent did not maintain his primary residence there during the *Golub* period, December 1, 1998 through November 30, 2000.

Although his exact diagnosis was disputed, it is established that respondent suffers from a mental illness, which includes a panic disorder, that has resulted in his feeling compelled to spend virtually all his time away from the subject apartment. The credible evidence established that respondent lived the lifestyle of a homeless person in a psychologically "safe" area within a 20-block radius of the building. He kept his personal possessions in the apartment, and his mail was delivered there, but notwithstanding his testimony to the contrary, which the trial court rejected as incredible, he rarely went there. He did not even maintain possession of the key, having given it into the custody of his girlfriend of 35 years, who used the apartment somewhat more frequently, as a place to shower and for storage of her personal possessions. The testimony that the trial court found to be credible, which Appellate Term left undisturbed, reflected that during the relevant period respondent stopped in at the apartment a handful of times but cannot be said to have resided there.

To begin the necessary analysis, we must first consider the landlord's initial burden in this unusual situation. The Rent Stabilization Code permits a landlord to recover possession of a rent-stabilized apartment that "is not occupied by the tenant . . . as his or her primary residence" (9 NYCRR 2524.4 [c]). Respondent suggests that to do so the landlord has the legal obligation to establish not only that the tenant does not reside in the subject apartment but also that the tenant has an alternative primary residence. In this regard, respondent relies upon this Court's holding that "[i]n a nonprimary residence case, the burden is on the landlord to establish that the tenant maintains a primary residence in a place other than the subject premises" (*Sharp v Melendez*, 139 AD2d 262, 264 [1988]).

Respondent also emphasizes the word "primary" in the phrase "primary residence," arguing that the concept implicitly requires the existence of a second residence, rendering one residence primary and the other secondary, and that the concept of primary residence is therefore, by definition, inapplicable when the tenant concededly has no other residence. Where there is only one residence, respondent contends, that residence is *necessarily* the tenant's primary residence.

We conclude, however, that the dissenting justice at Appellate Term in this case is correct: The statement made in *Sharp v Melendez* imposing on the landlord the burden of establishing that the tenant maintains a primary residence in a place other than the subject premises is simply inapplicable to circumstances such as these. Importantly, *Sharp v Melendez* and similar cases involved situations in which the basis of the landlord's claim was that the tenant resided in different premises than the one at issue. But, as the trial court here explained, establishing that the tenant has an alternative primary residence is merely one way for the landlord to meet its evidentiary burden; it is not the only way.

The essence of the nonprimary residence claim is that the tenant lacks an "ongoing, substantial, physical nexus with the controlled premises for actual living purposes" (*Emay Props. Corp. v Norton*, 136 Misc 2d 127, 129 [App Term, 1st Dept 1987]). The terms of the Rent Stabilization Code do not require proof that the tenant maintains an alternative primary residence (*see* 9 NYCRR 2524.4 [c]). A prima facie showing of nonprimary residence could be successfully made simply by proof that a rent-paying tenant was absent from the apartment and kept no belongings there during the relevant period, without the introduction of any information about where the tenant had gone.

The majority at Appellate Term, without rejecting the finding that respondent did not actually live in the apartment, held that his absence must be deemed excusable for purposes of nonprimary residence analysis because the record showed that "there was no abandonment of the premises or establishing of any new residence" (14 Misc 3d 65, 67 [2006], quoting *Katz v Gelman*, 177 Misc 2d 83, 84 [App Term, 1st Dept 1998]). But, the facts here are not comparable to those in *Katz v Gelman* or other cases in which tenants established that their extended absences from their apartments were excusable (*see e.g. Coronet Props. Co. v Brychova*, 122 Misc 2d 212 [1983], *affd* 126 Misc 2d 946 [App Term, 1st Dept 1984]). In *Brychova* the tenant demonstrated that she had to be away from home due to the exigencies of her profession. In *Katz*, the tenant was absent because of his health. Importantly, in each instance it was established that the tenant fully intended to return to and reside in the apartment as soon as practicable. In *Brychova*, the tenant was an itinerant professional soprano and voice teacher who spent all but a handful of days each year away from home at professional

engagements. In *Katz* the tenant was absent from his leased premises while he was institutionalized in various transitional residential facilities for treatment of depression and substance abuse, with the intent of preparing to return to independent living.

While, as in *Katz* (177 Misc 2d at 84), it is clearly a mental health problem that causes respondent to be absent from the subject premises, unlike the situation in *Katz*, there is no credible evidence indicating that respondent will ever return to and reside in the subject premises, or even that he has any intent to do so. Indeed, there is no reason to conclude, based upon the credible evidence in the record, that respondent can be cured of his need or compulsion to stay out of the subject premises. Regardless of how understandable is his decision to decline any offered medication or treatment, nothing in the record supports a conclusion that respondent had any true intent or ability to achieve a cure for his illness that would allow him to take up real residence in the apartment. Since there is no credible basis in the record to conclude that respondent might in the future be willing or able to resume actual residence in the apartment, the logic of *Katz v Gelman* has no application to this case.

The dissent, while agreeing with the conclusion of Appellate Term that respondent's absence is excusable and that he did not abandon the premises, also emphasizes testimony rejected by the trial court to the effect that respondent actually resided in the apartment during the period in question. While paying lip service to the rule that the trial court's findings of fact should not be disturbed unless they could not be reached under any fair interpretation of the evidence, the dissent essentially relies on the testimony of respondent and his companion to find, contrary to the trial court's finding, that respondent intends to reside in the premises in the future, and, indeed, that he has resided there since at least 2001. The dissent even cites the testimony that the trial court squarely rejected, in which both respondent and his companion stated that during the *Golub* period respondent was present in the apartment every day.

However, we decline to make new findings of fact upon our own review of the record, despite our authority to do so. There are important reasons for the deference with which we generally approach the findings of a trial court, particularly regarding credibility. A decision by a trial court adds up to more than the sum of its parts; it takes into account the judge's firsthand impressions, as well as the judge's experience with similar cases, particularly in specialized courts such as the Housing Court.

The trial court's finding regarding respondent's credibility should stand; by the same token, we should defer to the court's rejection of respondent's and his companion's testimony as to their continued presence in the apartment during the *Golub* period. Reliance on respondent's telephone bills to buttress the conclusion that respondent did not abandon the apartment is misplaced. It is already established that respondent's companion frequently uses the apartment and that respondent keeps personal possessions there and uses it as a mail drop. None of these facts establish his intent to return to live there, and neither do his telephone bills. The manner in which respondent uses the subject premises, as a storage facility and mail drop, should be recognized, and treated, as tantamount to an abandonment of the premises for residential purposes.

The dissent's citation to recent newspaper articles to support its assertion of facts regarding respondent's recent residence at the premises should not be countenanced. When we review an order on appeal, we do so on the evidence presented in the record on appeal, not on purported facts gleaned from newspaper articles. Indeed, in this matter the relevant time period of residency was December 1, 1998 through November 30, 2000. To the extent the respondent's future intent to reside in the premises was relevant, such intent had to be established before the trial court, not in assertions extraneous to the record and not even introduced by the parties. Furthermore, judicial notice of facts is reserved for "matter[s] of common and general knowledge, well-established and authoritatively settled" (Prince, Richardson on Evidence § 2-201 [Farrell 11th ed] [internal quotations marks and citations omitted]). Judicial notice of a fact such as a tenant's residency in a building may not properly be based upon a factual assertion simply because the assertion is contained in a newspaper article.

The evidence contained in the record that was accepted as credible by the trial court shows that respondent did not reside in the apartment during the *Golub* period, that he did not intend to return to reside there, and that there is no reason to believe he will be able to reside there in the future. However sympathetic respondent's plight, the concept of rent-stabilized tenancy is warped beyond recognition if a tenant who is permanently absent from the apartment, using it only as showering facilities for his companion and as storage space and mail drop for himself, without any indication that he will ever be able to reside there again, may nevertheless be entitled to be treated as a rent-stabilized tenant who has not abandoned the apartment.

It should be noted that when we conclude that a tenant who does not reside in his apartment may not properly be said to be using it as his primary residence, we are not "finding" that the tenant's primary residence is a park bench. I think we all agree that a person *cannot* maintain a primary residence on a park bench. But, the question for the court is solely whether the tenant has maintained an "ongoing, substantial, physical nexus with the controlled premises for actual living purposes" (*see Emay Props. Corp. v Norton*, 136 Misc 2d 127, 129 [1987], *supra*) or whether, instead, he has abandoned the premises that served at some earlier time as his residence. The answer is, during the relevant period respondent did not maintain the required substantial physical nexus with the premises for actual living purposes, and he had no expectation of doing so.

Having determined that respondent failed to counter petitioner's showing with his own credible evidence demonstrating either that during the *Golub* period he used the premises as his primary residence or that his absence is excusable, we may not allow respondent to claim the rights of primary residency based solely upon the use of the apartment by his longtime companion. This is not because we find that she is some sort of "transient girlfriend," as the dissent implies, but because the record does not establish tenancy rights on her part, despite her longtime relationship with respondent. As the dissent acknowledges, this proceeding did not raise or address any claim to succession rights or any other rights invested directly in respondent's companion.

I recognize that part of the impetus for the dissent's view is that the landlord here allowed the premises to become uninhabitable with the intent of emptying the SRO building of all tenants. Yet, the landlord's conduct and intentions, whatever we think of them, had no impact on respondent's virtual abandonment of the apartment as his residence. Had respondent successfully demonstrated that his absence from the apartment was due to its uninhabitable condition, and that he would return and reside there if it were made habitable, the landlord's conduct would have been relevant to the question whether respondent's absence from the premises should be considered "excusable" for purposes of primary residence analysis. But, the evidence established that respondent's absence from the premises was due to his mental illness, not the condition of the apartment.

Additionally, the fact that respondent applied for public housing that would accommodate his disability, stating on the ap-

plication that he was homeless, but failed to take the necessary action to accept the ultimate offer of an apartment within his "safe area" of the city lends further credence to the conclusion that his mental illness was the substantial impediment to his maintaining his residence in the subject apartment, or any apartment. Had he been motivated by the need for a clean and habitable apartment, rather than impelled by his mental illness, he would have done what was necessary to take the offered apartment.

The dissent correctly observes that the goal of the rent stabilization framework, "to alleviate the shortage of housing in New York City by returning underutilized apartments to the market place" (*Matter of Herzog v Joy*, 74 AD2d 372, 374 [1980], *affd* 53 NY2d 821 [1981]), is not served by permitting the ouster of this tenant, since the landlord's interest is in emptying the building of all tenants, rather than in replacing this tenant with a tenant who will actually reside there. Nevertheless, application of the primary residence rules is not limited to those landlords who can establish that they are acting in good faith to return underutilized housing to the market. Whether the tenant maintains an "ongoing, substantial, physical nexus with the controlled premises for actual living purposes" (*Emay Props. Corp. v Norton*, 136 Misc 2d at 129) depends upon the tenant's conduct in relation to the property, not the landlord's intended future use of the building.

The questions the Court must answer are: (1) did the petitioner establish that the tenant lacked an "ongoing, substantial, physical nexus with the controlled premises for actual living purposes," and (2) if so, did the tenant establish an intent to resume living in the premises when it became possible? Here, petitioner made the requisite showing, and respondent failed to establish an intent to return so as to overcome the prima facie showing. On the evidence before it, the trial court correctly determined that the apartment was not being used as respondent's primary residence and would not be so used in the future.

We conclude that petitioner's claim is established, based upon the facts as found by the trial court, that respondent does not, and will not in the future, use the subject premises "for actual living purposes," and that therefore it is not his residence.

Accordingly, the order of the Appellate Term of the Supreme Court of the State of New York, First Department, entered December 21, 2006, which reversed a final judgment of the Civil

Court, New York County (Gerald Lebovits, J.), entered July 7, 2005, awarding possession after nonjury trial to petitioner landlord in a nonprimary residence proceeding, and awarded final judgment to respondent tenant dismissing the petition, should be reversed, on the law, without costs, and the judgment of possession awarded in favor of petitioner landlord reinstated.

ANDRIAS, J. (dissenting). Because the majority, in the guise of protecting "those landlords who can establish that they are acting in good faith to return underutilized housing to the market," is in reality facilitating a notorious slumlord's 20-year effort to empty its building of all tenants by evicting respondent tenant from his rent-stabilized apartment in the landmarked Windermere on the dubious ground that he has abandoned the only home he has had for the past 35 years to take up residence in the city's streets and parks, I dissent. Not, as the majority suggests, because of undue sympathy for respondent tenant or a desire to rule against a notorious slumlord, but because the trial court's decision in petitioner landlord's favor is seriously flawed and riddled with significant misstatements of fact and mischaracterizations of the trial testimony. Accordingly, I would affirm the Appellate Term's well reasoned finding that respondent's absences from his apartment must be deemed excusable for purposes of nonprimary residence analysis, at least on this record, which shows there was no abandonment of the premises or the establishment of any new residence.

Petitioner seeks to recover, on nonprimary residence grounds, a rent-stabilized room in the Windermere, an eight-story single-room occupancy building at 400 West 57th Street in Manhattan, which was declared a New York City landmark in 2005 as an example of one of the first apartment buildings in New York. The now-59-year-old tenant, Michael Tsitsires, whose sole source of income is SSI benefits, has lived there since 1970, when he moved into the building with Alberta Lang, his constant companion for the past 35 years. His room is one of six rooms opening off a common hallway in a suite designated apartment 4A, which also has a common kitchen and two bathrooms. At the time that he and Ms. Lang moved into the apartment, all six rooms in the apartment were occupied; however, over the years, petitioner, which bought the building in 1985, allowed the premises to fall into a state of chronic disrepair. By 1996 there were only 11 tenants remaining in the entire building, and at the time of trial in 2005 there were only seven tenants remaining. At all times relevant to this proceed-

ing, Mr. Tsitsires was the tenant of record, and he and Ms. Lang were the only occupants of apartment 4A.

Petitioner's case is based solely on circumstantial evidence, since there is no direct evidence that respondent was not actually living in his apartment with Ms. Lang from December 1, 1998 to November 30, 2000, the so-called *Golub*, or relevant, period (*see Golub v Frank*, 65 NY2d 900 [1985]). Instead, petitioner relied upon the testimony of its former building manager Brian McBrinn, who, at the behest of petitioner's attorney, was paid approximately $3,000 to place a surveillance camera disguised as a smoke detector in the building's lobby from August 17 to December 3, 2001, in order to record the comings and goings of the tenants especially for this litigation. Mr. McBrinn testified that during the relevant period, at a time when he was not yet the building manager, he had never seen respondent in his fourth-floor apartment and only saw him, "in passing," six or seven times, in the building lobby. He also testified that he reviewed the 1,000 hours of videotape taken by the surveillance camera and was able to identify respondent entering the building on two occasions, November 24 and December 2, 2001 (the trial court's decision mistakenly states that he saw respondent only once on the videotapes).

However, not only was Mr. McBrinn's testimony regarding respondent's purported absence from the premises more than a year after service of the notice of termination "irrelevant to the issue of whether at the time petitioner served the notice of termination, respondent tenant continued to maintain a substantial physical nexus to the premises" (*Ascot Realty LLC v Richstone*, 10 AD3d 513, 513 [2004], *lv dismissed* 4 NY3d 842 [2005]), but, inasmuch as Mr. McBrinn did not personally see or personally videotape the comings and goings in the building's lobby depicted by the 1,000 hours of surveillance videotape that he reviewed, there was an inadequate foundation for the introduction into evidence of such videotapes, which were taken solely for purposes of this litigation (*compare People v Fondal*, 154 AD2d 476, 476-477 [1989], *lv denied* 75 NY2d 770 [1989] [videotape purporting to show defendant and his accomplice in the act of shoplifting admissible where store employee testified that he watched the event on closed circuit television as it occurred and that videotape accurately depicted what he observed]). In *Zegarelli v Hughes* (3 NY3d 64, 69 [2004]), the case cited by counsel at trial and, in my opinion misinterpreted by the trial court when it concluded that Mr. McBrinn did not have

to be next to the "tape" all the time, the Court held that there was nothing wrong with the authentication of the videotape of an accident victim since the videographer who took the video testified that it correctly reflected what he saw. The Appellate Division dissent in that case, which was essentially the basis for the Court's reversing and ordering a new trial, reflects that defendant's investigator personally made the surveillance videotape of plaintiff "quickly and vigorously" shoveling snow between the time of his automobile accident and trial (303 AD2d 916, 917 [2003]). Clearly, Mr. McBrinn was in no position to testify that the images on the videotape accurately depicted three months of activity in the building's lobby. He only reported to the court what he saw or did not see on the videotapes. The trial court never watched the videotapes. Petitioner argued that the videotapes were relevant because respondent testified at deposition that his usage of the apartment during the period depicted in the videotapes was the same as his usage of the apartment from 1998 to 2000. However, despite repeated efforts, counsel for petitioner was unsuccessful in his attempts on cross-examination to establish through respondent's own testimony that his pattern of daily activities during the relevant period, from December 1998 through November 2000, was the same as during that three-month period in 2001.

After a six-day trial in 2005, during which the court personally inspected respondent's room and found it to be virtually uninhabitable, the court found that petitioner had met its burden of showing that respondent did not use the apartment as his primary residence or for actual living during the *Golub* period, i.e., from December 1998 through November 2000. In pertinent part, the court found that respondent

> "maintained a homeless lifestyle likely caused, one psychiatrist explained, by substance abuse. Another psychiatrist stated that he is claustrophobic and hates his apartment . . . that petitioner proved that respondent abandoned the apartment to live on the streets, in the park, on stoops, and at his friends' homes . . . that respondent's mental disabilities do not constitute an excusable reason for his absence from the subject apartment [and] [r]espondent failed to show that he will return and use the apartment as a primary residence" (9 Misc 3d 469, 471 [2005]).

In reversing the trial court and dismissing the petition, Appellate Term noted that "[respondent's] testimony that, in addi-

tion to living on the street, he stays inside his apartment, without venturing out, for months at a time, was rejected by the trial court as incredible, and we do not second-guess the court's finding on that issue" (14 Misc 3d 65, 66 n [2006]). Nevertheless, although it did not question the trial court's finding on that particular point, it held that "[i]n the particular circumstances of this case, and considering the undisputed facts that tenant at all times kept his clothing and personal belongings in the apartment and received mail there, we find unavailing landlord's contention that tenant relinquished or abandoned the unit as his primary residence" (id. at 66). The court continued,

> "While the substantial emotional difficulties daily faced by tenant appear to have prevented him from actively using the apartment, tenant's absences must be deemed excusable for purposes of nonprimary residence analysis, at least on this record which shows that 'there was no abandonment of the premises or establishing of any new residence' (Katz v Gelman, 177 Misc 2d 83, 84 [1998])" (id. at 66-67 [footnote omitted]).

The majority suggests that Appellate Term's reasoning is somehow flawed and that "[w]hen the law is accurately stated, and applied neutrally to the facts as found by the trial court, it becomes clear that the findings of fact and conclusions of law of the trial court should have been upheld." However, while the majority would have us adhere to the rule that in a close case the reviewing court should take into account the fact that the trial judge had the advantage of seeing the witnesses and adopt the trial court's findings without question, this is not a close case. The trial court's decision, which the majority adopts without question, is seriously flawed and based on mischaracterizations and outright misstatements of the trial evidence and depends primarily upon deposition testimony that was never admitted into evidence and videotapes that were not only irrelevant but were also never properly authenticated and therefore should not have been admitted into evidence.

As but one example of its erroneous findings, the trial court states in its opinion that "[t]he entire EBT transcript was admitted into evidence on both side's [sic] consent" (9 Misc 3d at 479); however, there is nothing in the record that reflects such consent. Indeed, the record indicates just the opposite. After counsel for respondent said she was going to move to strike

petitioner's posttrial memorandum because, rather than citing the trial transcript, it repeatedly cited deposition testimony and other items that were not in evidence, the court specifically asked:

"Remind me, was the deposition transcript put in evidence?

"TRISHA LAWSON [counsel for respondent]: No. Pages 143 to 148 of the second day, November 30th were stipulated that that's in fact what was transcribed at that time. There was no—

"THE COURT: Nothing else?

"TRISHA LAWSON: No.

"THE COURT: Okay."

Despite the fact that the deposition testimony was never admitted into evidence and counsel for petitioner never used it to impeach respondent on cross-examination, it was heavily relied upon in support of petitioner's arguments in its posttrial memorandum. These arguments seem to have been fully adopted by the court, which used respondent's deposition testimony as a major basis for finding his trial testimony incredible. The court's decision compared Mr. McBrinn's testimony to respondent's deposition testimony that he regularly used his apartment while the video camera was recording the activity in the building's lobby and concluded that "[t]hat discrepancy shows the unreliability of respondent's testimony" (id. at 483). The court also used respondent's deposition testimony to support the most important part of its decision when it stated that "[r]espondent further corroborated McBrinn's testimony when he stated at his EBT that he used the subject apartment for the same amount of time during the Golub period as he did when petitioner was videotaping the subject premises' lobby" (id. at 486). Even counsel for petitioner who, as noted by counsel for respondent, improperly recited deposition testimony and other items not in evidence in his posttrial memorandum, acknowledged, in summing up to the court, that "[t]he evidence that was presented basically consisted of verbal testimony from Brian McBrinn versus the verbal testimony of Michael Tsitsires, as well as the documentary evidence that was presented, the Article 78 admissions as well as the videotape." Yet, despite that argument in open court, in his posttrial memorandum, counsel for petitioner stated that petitioner's case was addition-

ally proven through "[r]espondent's testimony both at his EBT and trial." Given such a patently erroneous mischaracterization of the trial evidence and the trial court's mistaken reliance upon it in its decision, there is no need to give the decision any deference, and Appellate Term, like this Court, had the authority, which is as broad as that of the trial court, to render the judgment it found warranted by the facts (*see Northern Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492, 499 [1983]; CPLR 5501 [d]).

Now, in reversing Appellate Term and adopting the trial court's decision without question, the majority dismisses our holding in *Sharp v Melendez* (139 AD2d 262, 264 [1988] ["In a nonprimary residence case, the burden is on the landlord to establish that the tenant maintains a primary residence in a place other than the subject premises"]) as "simply inapplicable to circumstances such as these." It then concludes that "[a] prima facie showing of nonprimary residence could be successfully made simply by proof that a rent-paying tenant was absent from the apartment and kept no belongings there during the relevant period, without the introduction of any information about where the tenant had gone." In other words, absent any evidence that respondent has taken up residence elsewhere, petitioner only has to prove that respondent abandoned his apartment. While the majority agrees that if there were any basis to conclude that respondent might in the future be willing or able to resume actual residence in the apartment we could properly employ the logic used in *Katz v Gelman* (177 Misc 2d 83 [1998], *supra*), it completely ignores the testimony of petitioner's only fact witness, Mr. McBrinn, and finds that no such evidence exists.

Moreover, despite the majority's intimations to the contrary, the applicable law is not in dispute, only its application to the facts of this case. And, even using the standard espoused by the majority, it is clear that petitioner has not met its prima facie burden of proof, since it is undisputed that respondent and Ms. Lang kept all of their furniture, appliances and personal belongings in their apartment throughout their tenancy. In fact, that they, like every other apartment dweller, kept or "stored" their personal belongings in their apartment is used against respondent by petitioner, the trial court, and now the majority to find that he did not live in his apartment, but used it only to store his belongings, as a mail drop, and to let his girlfriend take showers. As explained by counsel for respondent at trial,

however, counsel was the one who first used the terms "stored" or "storage," when she asked respondent if he rented storage space elsewhere or stored his belongings anywhere other than his apartment. Counsel for petitioner then started using the term, and it was adopted by the trial court and now the majority to conclude that the apartment was only used as storage space. There is simply no testimony to support such a conclusion.

As to petitioner's burden of proof, the trial court correctly noted that determining a tenant's physical nexus to his apartment is "a fact-sensitive inquiry" and that,

> "[u]nder New York City Rent and Eviction Regulations (9 NYCRR) § 2200.3 (j), the factors the court must consider include, but are not limited to (1) whether respondent uses an alternative primary address on any tax return, motor vehicle registration, driver's license, or other document filed with a public agency; (2) whether respondent registered to vote using an alternative address; (3) whether respondent lived in the apartment for less than 183 days in the most recent calendar year; and (4) whether respondent sublet the apartment" (9 Misc 3d at 489).

It also correctly noted that no one factor is determinative and that other factors are considered by the courts. However, in its decision, the court used the only documentary evidence of respondent's residence, i.e., his phone bills and bank statements addressed to him at his apartment, against him, and never addressed the most obvious factor relevant to this case, i.e., whether the tenant's alleged absence from his apartment was for 183 days a year or more.

With regard to that issue, respondent testified that during the period in question he spent seven or eight months out of each year in his apartment, the amount of time varying with the season. In response to petitioner's counsel's question on cross-examination, respondent denied that he "might have been during the window period not at the apartment for six months out of the year." Also, contrary to the trial court's characterization in its decision, respondent never testified "that he would not spend any time in the apartment for weeks and sometimes months at a time" (*id.* at 479). When he was asked by the court, "Those months when you were not at home, where were you?," respondent replied "It wasn't always months. I am saying over

years, times it might have went into months [i.e., cumulatively]." Moreover, the court, which did a tally of the time respondent spent away from his apartment during the entire two-year period, found that "[i]t is somewhere between four to a little less than six months." Thus, even accepting that figure as accurate, and petitioner does not even mention or question it, there is no evidence that respondent ever exceeded the 182-day period of unexplained absence permitted by the applicable statute. Indeed, counsel for petitioner, who at times appeared to be mischaracterizing respondent's testimony and putting words in respondent's mouth, specifically asked, "Would it be correct to say when you said you spend more than six months a year in the apartment that you spend more than 183 days away from the apartment?" Respondent answered, "No, I don't think so."

The majority also states that "there is no credible evidence indicating that respondent will ever return to and reside in the subject premises, or even that he has any intent to do so"; however, this statement overlooks the cross-examination testimony of petitioner's only fact witness, Brian McBrinn, that clearly establishes that respondent, while perhaps adopting what the trial court characterized as a "homeless lifestyle" because he spent a lot of time away from his apartment, never abandoned his apartment and always considered it his home or, as relevant to this appeal, his primary residence. Curiously, the majority makes no mention of and studiously ignores Mr. McBrinn's testimony, which the trial court found "honest and accurate" and "exceptionally candid and reliable" (*id*. at 483).

While much was made of Mr. McBrinn's testimony that he never saw respondent going into or coming out of his apartment, Mr. McBrinn also testified that the first and only time he was ever in apartment 4A was after the relevant period, when he went there with respondent, Ms. Lang, and respondent's attorney to install emergency lighting and carbon monoxide and smoke detectors. Even then, he only was in the front part of the common hallway in the apartment and never saw respondent's room, which was at the far end of the hallway. Nevertheless, Mr. McBrinn's testimony is significant not so much as to his observations in the postpetition period from August to December 2001, but as to his observations in the building during the relevant period.

Aside from its attempt to use events subsequent to the relevant period to prove its case, petitioner proceeded primarily on the theory that if Mr. McBrinn, who was only a frequent visitor

to the building at the time (he never lived in the building and did not become its manager until December 2000), did not see respondent during the relevant period, then the only conclusion to be reached is that respondent was not there. However, the trial court, in adopting this rationale, discounted respondent's testimony to the contrary in a highly selective manner, and ignored the testimony of Ms. Lang and Mr. McBrinn that painted a very different picture.

Mr. McBrinn, who had been hired as the building's superintendent and managing agent in December 2000 but had recently been fired for making the building less desirable to prospective buyers by telling them that there were still rent-stabilized tenants in the building (rather than squatters as claimed by the building's owners in Tokyo), testified that during the relevant period he was only an independent contractor who did whatever work was needed in the building. He also testified that petitioner, an absentee landlord that wanted to empty the building and treated the few remaining tenants like "dreck," told him to do the bare minimum in repairs to avoid Buildings Department violations.

Mr. McBrinn testified that the few times he ran into respondent in the building were in passing as he (Mr. McBrinn) entered or left the building. Respondent testified that in order to avoid people he would wait outside until the lobby was empty and then rush upstairs to his apartment. This is consistent with McBrinn's testimony that, whenever he saw respondent in the lobby, he seemed to be waiting. Ms. Lang also testified that she tried to avoid McBrinn. Although he visited the building during "business hours" to make whatever meager repairs he was told to do, he regularly visited his best friend, the resident building manager, who apparently was dying and who lived in an apartment across from the mailboxes, which were located off the lobby and around the corner from the elevator. However, when he was in that apartment, he could not hear, let alone see, what was going on in the lobby. Mr. McBrinn testified that although he seldom or never saw respondent in the building, Ms. Lang "was in and out of the building all times on a continual basis." The court: "So you didn't see him very often and when you saw him, you saw him outside." The witness: "Exactly. He was the most notorious agoraphobic, claustrophobic."

Significantly, again with regard to the pertinent period of time between 1998 and 2000, Mr. McBrinn testified: "I'm simply saying there was definite activity in and out of the apartment.

It was not lying fallow." As to Ms. Lang, he testified that he saw her "very regularly" going up into the apartment where she would sometimes remain for five minutes. "Sometimes she would be up there for a long time, it was totally random." Mr. McBrinn also testified that "there were clearly people inside, but they weren't coming to the door." On other occasions when he went to the apartment, or he did inspections of the building from top to bottom on a continual basis ("probably a couple of times a day"), he would notice that "there was someone inside, but they never made themselves known to me." This testimony is significant because there was no evidence that anyone other than respondent and Ms. Lang was living in the apartment. Yet the majority totally ignores it.

When asked why he said that respondent lived on the street and it was impossible to get in touch with him, Mr. McBrinn answered: "Um, I guess it's hearsay." When he spoke to respondent subsequently, respondent told him that he had "problems."

> "Q. Did he admit he lived on the street to you?
>
> "A. For a period of times, yes, but always with the understanding that that was where he lived. That was his apartment. That was his home. That was his residence. . .
>
> "Right, this is where he lives. This is his home."

As to apartment 4A, where respondent had a room, Mr. McBrinn could tell that "it's been occupied consistently."

Mr. McBrinn's testimony is consistent with respondent's own testimony regarding his reclusiveness, which was plausible, given his emotional problems. For example, when asked how often he saw Mr. McBrinn, he responded,

> "[B]etween me avoiding him and him not being around too often I would say I see him maybe once a week or once every two weeks, something like that.
>
> "Q. Do you answer your door if someone knocks on it?
>
> "A. No way.
>
> "Q. What do you do?
>
> "A. I just remain silent and hope they go away."

At another point respondent was asked how often he saw the other tenants in the building, to which he replied,

"Not very often."

"Q. And during the relevant time period how much did you see?

"A. Less because I avoided them.

"Q. What steps did you take to avoid seeing other tenants?

"A. If I was ready to leave my apartment I heard somebody in the hallway I waited until they went about their business, either went into their house or got in the elevator and left. If I was coming in the building and someone was behind me I would rush upstairs to my house and get inside or I would kind of hide around the corner because over the years it became like tenant against tenant."

Mr. McBrinn further testified that after he and respondent started talking during the summer of 2004, respondent

"was very available and he looked—he looked like a different person. I mean he looked—he looked healthy and he was outgoing and able to talk and when we did. You know, suddenly I would see him a lot in the building, you know, it was nice to see him. He was [an] earful, we talked about just stuff relating to the building."

This testimony is consistent with the evaluation of respondent's expert, who found that respondent was no longer suffering from depression. It is also consistent with respondent's testimony that when he realized that petitioner was trying to evict him he made a concerted effort to make himself more visible in the building.

With regard to the condition of the building, Mr. McBrinn testified that he did the minimum maintenance to make the building seem "superficially sound and in compliance with City regulations as much as possible, so that they were not cited, getting violations and dragged into court." Mr. McBrinn also testified that all of the apartments in the building are bad, but some are not as bad as others, and that respondent complained to him that there was mold in his apartment but said he wasn't going to make a fuss because he knew he wasn't going to get anything fixed. Respondent never asked Mr. McBrinn to make repairs because he knew that petitioner would not make repairs in any event. Mr. McBrinn also recalled that from 1996 to 2000

his friend, the building manager, told him he had been approached about many repairs that had to be made in apartment 4A, but Mr. McBrinn did not know whether such complaints were made by respondent or Ms. Lang.

Respondent and Ms. Lang testified that the stove in the common kitchen had not worked for 10 years, and the refrigerator had not worked for the past six years, and one of the two bathrooms was unusable because the ceiling had fallen in. Thus, despite petitioner's contention and the trial court's finding that respondent adopted a homeless existence because he "hated" his apartment, it is not surprising that respondent argues that, given the apartment's deplorable condition, anyone of sound mind or otherwise had good reason for hating the conditions he was forced to live under. In any event, the notion that respondent hated his apartment is based solely upon a notation in his medical records that sometime during the 1980s he once said that to his therapist.

The trial court also gave credence to the now oft repeated canard that Ms. Lang was some transient girlfriend who occasionally stopped by the apartment to pick up mail and take a shower. On the contrary, the uncontradicted testimony of all witnesses, including Mr. McBrinn, clearly established that Ms. Lang moved into the apartment with respondent and lived there with him for 35 years and, although the matter is not in issue in this proceeding, she would likely be entitled to succession rights under the rent stabilization laws. The majority, without any analysis or factual support, simply repeats this canard by stating that respondent did not even maintain possession of the key, instead giving it to his girlfriend, "who used the apartment somewhat more frequently, as a place to shower and for storage of her personal possessions."

Both respondent's and Mr. McBrinn's testimony was buttressed by that of Ms. Lang, whose testimony was seemingly accepted as credible by the trial court, and who, when asked her relationship to respondent, replied, "I guess you'd say wife." Respondent variously described her as his "wife," "significant other" or "girlfriend." She testified that on an average day during the relevant period, from December 1998 through November 2000, she spent all day with respondent ("well pretty much all the time except, you know, we would go outside during the day or sometimes we go for walks at night, you know, pretty much all day").

Ms. Lang further testified that at no time during the relevant period did respondent stay for periods of time in another apart-

ment; that she and respondent did not work and did not keep regular hours; that she and respondent had no particular schedule; that respondent went into the apartment "every day" during the relevant period; and that they spent time in the park and generally ate out ("Sometimes we bring food in, yes, but we can't cook there because we—we don't have a cooking stove. At the time the stove was not working"). She also testified that she went to the apartment two or three times a week during the period from August to December 2001, but did not remember how often respondent went there during that time.

Ms. Lang also testified that during the relevant period she and Mr. McBrinn had different schedules and, like respondent, she "was trying to avoid him. So I wouldn't see him that often . . . Couple times a week maybe." When asked whether during the relevant period respondent stayed away from the apartment "for blocks of time," she replied: "No. Not that I know of. I can't remember." She testified that she and respondent slept at the apartment daily, albeit at odd and irregular hours, and that she did not have any other residence of her own.

Respondent and Ms. Lang both testified that they kept very irregular hours; that respondent was essentially a night person; and that respondent and Ms. Lang went out of their way to avoid meeting people in general and Mr. McBrinn in particular. As to respondent's testimony that he sometimes spent weeks or months on end in the apartment without coming out, the trial court simply found it incredible even though such behavior seems very plausible for a person with respondent's mental problems. On the other hand, it seems to have credited respondent's testimony that at other times he would spend a great deal of time outside. For instance, with regard to respondent's conceded psychological problems, the court concluded this testimony established that respondent was never in the apartment and lived in Central Park and on the streets. It then used that scenario to pose a hypothetical question to petitioner's psychiatric expert, in response to which the expert opined that it was likely that "substance abuse was playing a part" in respondent's behavior.

Although the majority faults my reliance upon the testimony of respondent and Ms. Lang that respondent was in his apartment every day during the *Golub* period—testimony it says the trial court "squarely rejected"—it fails to point to anything in the record that indicates that the court rejected Ms. Lang's

testimony in any respect. In fact, the trial court never rejected Ms. Lang's testimony. On the contrary, in finding certain parts of respondent's testimony unreliable, the trial court did so because the testimony conflicted with or was contradicted by the testimony of Ms. Lang and Mr. McBrinn or by the videotape.

As to whether this Court's statement in *Sharp v Melendez* (139 AD2d 262, 264 [1988], *supra*) is simply inapplicable to circumstances such as these, as claimed by the majority, it is readily apparent that it was an accurate statement of the landlord's burden of proof in the context of that case, which presented the question of whether the tenant of record of two noncontiguous rent-stabilized apartments in the same building could claim both as his primary residence. Likewise, it was an accurate statement of the law in *Katz v Lubotta* (NYLJ, May 20, 1985, at 13, col 6 [App Term, 1st Dept], *lv denied* Dec. 12, 1985, M-5605 [cited by the *Sharp* court]), where the question was whether the tenant maintained her rent-stabilized New York apartment as her primary residence despite the fact that she admittedly spent the winter months in Florida.

Here, as the trial court, Appellate Term, and even the majority recognize, the issue is not necessarily whether respondent has established his primary residence elsewhere at some specific location, but whether he has abandoned the only place he has used as his primary residence for the past 35 years with no intention of returning.

The majority concludes that

> "[h]ad respondent successfully demonstrated that his absence from the apartment was due to its uninhabitable condition, and that he would return and reside there if it were made habitable, the landlord's conduct would have been relevant to the question whether respondent's absence from the premises should be considered 'excusable' for purposes of primary residence analysis."

Yet it finds that "the evidence established that respondent's absence from the premises was due to his mental illness, not the condition of the apartment."

Again, such conclusion is belied by the trial testimony. For example, respondent testified that he spent little time in the apartment during the summer because there was insufficient wiring to have air conditioning and the apartment was stifling. On certain occasions during the winter, when the heat in the

building was out of order, he would stay overnight with a friend. Moreover, the majority claims that the fact that respondent's lifestyle was unrelated to the condition of the apartment is further demonstrated by the fact that when he was eventually offered an apartment in public housing he failed to take action to accept the offer. However this conclusion totally ignores or discounts respondent's uncontradicted testimony on the subject.

Respondent testified at trial that he was fearful of being evicted and that, although he never wanted to live in the projects, he applied for public housing and said that he was homeless in order to get priority. Ms. Lang, who seems to do all the paperwork for the couple and filled out the housing application for respondent, testified that they said respondent was homeless because several social workers told them their living conditions equated to homelessness. Respondent also testified that, although he had been offered public housing on two occasions, each offer was withdrawn ("The first one they said it was too large an apartment, the second one they said it was gone"). By that time, he testified, this eviction proceeding had been commenced and he gave up on finding other housing and devoted his energies to keeping the only home he had known for 35 years. Lying? Well nobody ever says that Ms. Lang is lying, but petitioner argues, and the trial court found that respondent's testimony was incredible because he seemed to have a selective memory, remembering facts that were favorable to him but being unable to recall facts that were unfavorable to him.

Respondent's psychiatrist explained that this is common among people with an obsessive-compulsive disorder. But petitioner's psychiatrist testified that the combination of ailments, obsessive-compulsive disorder with agoraphobia and claustrophobia, described by respondent's psychiatrist is not contained in the Diagnostic and Statistical Manual of Mental Disorders, a manual developed to provide billing codes for medical insurance purposes. So, for that and other dubious reasons, the court accepted the opinion of petitioner's psychiatric expert because, after reviewing just 100 pages of respondent's 500-page medical report, he found some references to prior substance abuse that respondent's psychiatrist (who was simply answering questions asked of her at trial) did not mention. However, the only mention of prior substance abuse was contained in a 1992 hospital emergency room record. Respondent also admitted that he had used marijuana and tried LSD in college more than 30 years earlier and had become addicted to Valium in the

1970s. Respondent's psychiatrist was also faulted for not taking blood and urine samples to rule out present substance abuse, and for not administering certain standard questionnaires before diagnosing the aforementioned combination of ailments. Although a board certified psychiatrist, she was not a board certified forensic psychiatrist as was petitioner's expert. So the trial court accepted petitioner's expert's diagnosis (he did not conduct any tests either) that respondent only has an "anxiety disorder not otherwise specified," i.e., he has panic attacks, and that respondent's behavior might possibly be related to substance abuse. As to respondent's trial testimony denying any alcohol or substance abuse since the 1970s and reporting that he had not had a drink in more than 25 years and did not take any drugs, we are asked to discount such testimony because self-reporting of substance abuse is often inaccurate. Nevertheless, despite the absence of evidence of recent substance abuse by respondent, the trial court accepted to some extent the hypothesis that respondent's homeless "lifestyle" was somehow related to substance abuse, and the majority now uses respondent's refusal to take medication to alleviate his panic attacks as evidence that he has no intention and no ability to ever return to his apartment.

Respondent also once told his therapist (sometime in the 1980s) that he hated his apartment. Therefore, we are supposed to conclude that he is compelled to stay out of his apartment not because of its unliveable condition but solely because of his mental problems and his unreasonable hatred of his apartment. However, respondent and Ms. Lang both testified that sometimes when he had these panic or claustrophobic attacks he had to get out of his apartment (sometimes it had the opposite effect and he would stay in bed for weeks).

In any event, regardless of what the proper diagnosis for respondent's behavior is, one thing that is readily apparent from his testimony is that he has no concept of time. On the one hand he would remember seemingly minor details about certain events, while on the other he could not recall or place a specific time frame for many others. Thus, while respondent's lifestyle could be described as unconventional, to say the least, much of his behavior was attributable to his various emotional problems. Contrary to the majority's conclusion that petitioner's neglect of the building and its intention to empty the building of all tenants is irrelevant because the evidence establishes that respondent's absence from the

premises was due solely to his mental illness and not to the condition of the apartment, there is ample evidence in the record that respondent's absences from his apartment were the result of a combination of both factors.

How should we treat respondent's testimony? The trial court seems to have concluded that because respondent lied to get a preference for public housing, he must be lying now to hold onto an apartment he hates and doesn't even live in. As to any of respondent's testimony about his reclusive and other strange behavior, the court found it incredible even though respondent admittedly has severe mental problems. What about McBrinn's testimony on cross-examination about the use of the apartment by someone and respondent's stated intention to stay there? The trial court and the majority simply ignore it.

As a final example of the trial court's mischaracterizations of the trial testimony and its reliance upon such mischaracterizations in its decision, the court states that "Lang stated that the apartment was in much worse condition years ago," and concludes, "that the conditions were worse then gave respondent a motive not to live there and shows either that he did not live there—so that he did not care about the apartment's uninhabitable conditions—or that he is so substance abused that he did not know habitable from uninhabitable" (9 Misc 3d at 480, 484). However, when asked to compare the present condition of the apartment, which the court and the parties had visited that day, to its condition during the relevant period between 1998 and 2000, Ms. Lang testified that "it [now] had a lot more leaks, a lot more mold, a lot more plaster falling, a lot more water coming through. So, it's not as neat as it was then." Their personal belongings in the apartment were essentially the same except that they had recently gotten a new microwave. Again, the trial court reached a conclusion based on surmise and innuendo that is unsupported by the trial testimony.

Nevertheless, the majority concludes that "petitioner's claim is established, based upon the facts as found by the trial court, that respondent does not, and will not in the future, use the subject premises 'for actual living purposes,' and that therefore it is not his residence."

These conclusions, however, totally ignore the foregoing "honest and accurate" and "exceptionally candid and reliable" testimony of Mr. McBrinn that respondent never had any intention of abandoning his home and that, aside from

his avowed intention and willingness to resume residence in the apartment, he has actually been residing there since at least 2001. Moreover, although it might be debated whether facts stated in a story in the New York Times are sufficiently "notorious" for purposes of taking judicial notice (*see generally* Prince, Richardson on Evidence § 2-203 [Farrell 11th ed] ["In general, judicial notice will be taken of all 'notorious facts'"]), I would simply note as a postscript to the events portrayed at trial that, on September 19, 2007, respondent and Ms. Lang were two of the last remaining tenants—seven in all—evacuated from the Windermere and relocated to a nearby hotel until the necessary repairs could be made after Fire Department inspectors found unsafe conditions and closed the building (*see* Ramirez, *Fire Dept. Orders Windermere Tenants Out*, New York Times, Sept. 22, 2007, at B3). We should not close our eyes to this subsequent event, which simply reinforces Appellate Term's finding that respondent, who testified that, if he were evicted and forced to live on the street, it would be "a death sentence," never abandoned his apartment and indicates that he actually continued to live there as recently as last September.

As to the majority's concern for those landlords who in good faith seek to recover rent-stabilized apartments not used by their tenants as primary residences, the applicable law is not in dispute, only its application, and the courts that deal with such issues most frequently have had no difficulty in deciding the issue of nonprimary residence on a case-by-case basis, which is exactly what Appellate Term, relying upon well settled principles, did here.

Finally, I agree with Appellate Term that the goals of the primary residency criteria would not be served by holding that a tenant whose only other residence is the streets and parks of New York City has abandoned his primary residence. Furthermore, awarding possession to a landlord who, the record establishes, allowed the premises to become virtually uninhabitable while making concerted efforts to empty the premises of all tenants would be contrary to the overriding public policy "goal of ensuring an adequate supply of affordable housing" embodied in the rent stabilization laws (*390 W. End Assoc. v Harel*, 298 AD2d 11, 16 [2002]; *see also Buchanan v TOA Constr. Co.*, NYLJ, May 31, 1989, at 21, col 1 [App Term, 1st Dept], *lv denied* 1989 NY App Div LEXIS 14636 [1st Dept 1989]).

Accordingly, the order of the Appellate Term should be affirmed.

GONZALEZ and SWEENY, JJ., concur with SAXE, J.; MAZZARELLI, J.P., and ANDRIAS, J., dissent in a separate opinion by ANDRIAS, J.

Order of the Appellate Term of the Supreme Court of the State of New York, First Department, entered December 21, 2006, which reversed a final judgment of the Civil Court, New York County, entered July 7, 2005, reversed, on the law, without costs, and the judgment of possession awarded in favor of petitioner landlord reinstated.